**RICHARD V. BEATTY, Plaintiff**

**v.**

**JOHN C. CLARK, INC., Defendant**

Civil No. 74-591

District Court of the Virgin Islands

Div. of St. Thomas and St. John

January 27, 1975

FREDERICK WATTS, ESQ., St. Thomas, V.I., *for plaintiff*
ETHEL C. HUNTER, St. Thomas, V.I., *for defendant*
CHRISTIAN, *Chief Judge*

## MEMORANDUM OPINION

This case involves the enforcement of a restrictive covenant in a deed to real property located in Estate Nazareth, St. Thomas, Virgin Islands. Plaintiff Beatty, on behalf of himself and other homeowners similarly situated, filed suit for an injunction barring defendant John C. Clark, Inc., a Maryland corporation, from operating The Sea Lord Club, a private membership club, on Lot No. 8-31 Estate Nazareth, Red Hook Quarter. A temporary restraining order was issued by this Court on October 7, 1974, and hearings on the action for a preliminary injunction were had on October 17, 18 and November 21, 1974.

The property here involved, both that of the plaintiff and defendant, was originally part of a Trust administered under the last will and testament of one Charles Redfield Vose. The trustees conveyed all of that land to the Cowpet

Bay Corporation which, pursuant to a "master plan" drawn up in the early 1960s, has gradually developed the real estate in that area as a planned community. William Evans, an officer of that corporation and a trustee and executor under the Vose will, testified at the hearing. The Cowpet Bay Corporation is the common grantor of all the land involved in this action.[1] Defendant got its title from one Lambert, who had built on the property what is commonly known in the community as "Lambert's Castle," a sprawling, turreted building with seven bedrooms and baths, fronting the beach, which had been used by Lambert as a private dwelling.

Both Beatty's deed to Parcel No. 8-8 from Vardaman (the grantee of Cowpet Bay Corporation in 1965) and defendant's deed from Lambert contain identical restrictive covenants which run with the land. The covenant which plaintiff here seeks to enforce provides:

> (a) Since the area is strictly residential, only single family dwellings shall be permitted, and no more than one such dwelling of a single story shall be constructed on any subdivision parcel without the written approval of the seller.

Defendant, although fully cognizant of the restriction contained in its deed, bought the property for the express purpose of conducting what its representative, Will Flascher, described as a private club. Defendant contacted all the homeowners in the development, explained his plan, and in effect solicited advance membership. There was testimony for the plaintiff that from the outset defendant's proposal was greeted with opposition, and that such opposition at no time wavered. In fact, letters from other of Beatty's neighbors were admitted into evidence, in which they not only expressed their displeasure with the scheme,

---

[1] This statement may be misleading. In reality, Cowpet Bay Corp. was the original grantor of all the properties in this development once the land was removed from the Trust, and all the parties can trace their ownership back to it, if not immediately, no more than two conveyances removed.

but also authorized Beatty to go to court in their behalf. (Exh. 7) Nonetheless, defendant purchased the property, continued its membership solicitation and went so far as to apply for certain licenses required by Virgin Islands law.[2] The questions raised specifically by this action are: (a) Whether these restrictions were inserted in furtherance of a unified plan of development; (b) Whether enforcement should be denied because of a substantial change in the character of the neighborhood; (c) Whether there has been such toleration of other infractions as to constitute waiver and abandonment, thus estopping plaintiff from now complaining of this particular violation; (d) Whether the reservation in the common grantor to approve building contrary to the restrictions makes it all null and void; and (e) Whether plaintiff, in order to succeed, must show harm or injury of any kind.

As a prefatory matter, it should be noted that this particular plaintiff does have standing to bring this action. Retriction (m), common to all the deeds, provides:

Seller or *any owner of land in the subdivision to which those covenants apply* shall be entitled to a decree of injunction against any threatened or continuing violation of any of these covenants. (emphasis supplied).

See also Grubel v. MacLaughlin, 6 V.I. 490, 286 F.Supp. 24 (1968); Neal v. Grapetree Bay Hotels, Inc., 8 V.I. 267 (1971).

Mr. William Evans, president of Cowpet Bay Corporation, discussed at great length during the hearings his original and ultimate plans concerning the development of

---

[2] Much time at the hearing was spent on debating the necessity of certain kinds of licenses, and the legal effect of the lack thereof. None of these questions need be reached, however, as the case can be decided independently of them. There is also no need to discuss or decide the dispute as to the capacity of the septic system and parking lot, which were raised in connection with an allegation of nuisance, or of the question whether this private club, if indeed it is such, is permissible under the provisions of R-1 housing in the zoning code.

this area of St. Thomas. He offered a drawing (Exh. 17), circa 1962–63, which demonstrated the corporation's long range concept as to what the development should contain. This included not only a high-income residential area, but also recreational facilities, other forms of housing (condominiums, apartments, etc.), a proposed hotel, and neighborhood shopping facilities. Defendant argues that because the developmental plans were on such a large scale, and inclusive of many non-residential uses, enforcement of the covenant in its deed is inequitable. Part of its argument is that since all the land is part of the same development, it is unfair to say that one particular portion should be residential, especially when other non-residential facilities (e.g., the Virgin Islands Yacht Club) are in such close proximity.

Although a zoning exception was sought and granted for the purpose of building a hotel, action has been held in abeyance as to it for many years. As a matter of fact, aside from the Cowpet Bay Condominiums and the residential housing at issue, few of the other grandiose plans ever were put into effect. The Virgin Islands Yacht Club, located nearby, was originally part of the land administered by the Trust, but was withdrawn from it and has been in operation since 1966. Mr. Beatty purchased his property from Dr. Vardaman in 1969. Mr. Evans testified that there were three parcels, numbers 8, 9 and 5, which were to be kept mostly residential. Both plaintiff, defendant and plaintiff's amici[3] own land in Parcel No. 8. What is more important, all those properties located in Parcel No. 8 contain the same restrictions, while it is by no means clear that the same, if any such restrictions attach to the balance of the land held, developed and conveyed by Cowpet Bay Corporation.

---

[3] By "amici" I refer to those of Beatty's neighbors who wrote letters offering support and who authorized him to go to court in their behalf.

■ There is some question as to whether defendant's proposed venture is in reality a private club or an effort to clothe a public hotel and restaurant in the garb of one so as to circumvent the zoning regulations.[4] Mr. Flascher testified that meals and catering services would be available to members and guests both daily and on a special reservation (i.e., private party) basis, and that a bar providing alcoholic beverages would be operated. Further, the sleeping facilities would also be made available on a long- or short-term basis. It is unnecessary to decide this factual dispute, however, since if the restriction is valid and enforceable, it properly excludes the use of the Castle as either, irrespective of the uses permitted by the zoning code. Despite the fact that the zoning of this area may permit the erection and use of a building as a private club, the more stringent restriction contained in the covenant limiting use to single-family dwellings, if it is to be upheld, must take precedence. Staninger v. Jacksonville Expressway Authority, 182 So.2d 483, 22 A.L.R.3d 950 (Fla. App. 1966); Restatement of Property Section 568; 20 Am.Jur.2d Covenants, Conditions, Etc., Section 277.

■ Defendant attacks the restriction on a phrase-by-phrase basis. It claims that the preamble, "since the area is strictly residential" is false and was false at the time it was first recorded in a deed in the early 1960's. The basis for this objection, as to others, is the master plan of development calling for the numerous non-residential uses recited above. As also pointed out above, however, most of those plans have fallen short of fulfillment. Most important, even on the master plan, certain areas are broken up and designated as purely residential. Defendant claims that plaintiff has failed in its burden to show that a sufficient number of deeds in the area are burdened with the re-

---

[4] For a case strikingly similar, see Polhemus v. Delisle, 130 A. 618 (N.J. Ch. 1925).

striction to merit enforcement. We disagree. Given the monumental scale of the original concept, the clear-cut enclaves to be devoted to residential use, and the fact that plaintiff and defendant own land, containing reciprocal restrictions, in parcel No. 8 which Evans stated was to be kept mostly residential, it seems to us that the restriction has substance and merits enforcement, absent intervening factors.

■ Nor does the fact that the restriction reserves some discretion in the Seller to waive certain requirements change the validity of the covenant. We recognize that the weight of authority supports the rule that a reservation by the common grantor of a general power to dispense with the restrictions on particular lots negatives the purpose of uniform development from which the mutuality of right among lot owners in a platted subdivision is deemed to arise. We are also aware that, generally, where such a power is reserved, one lot owner cannot enforce the restrictions as against another lot owner even though the dispensing power of the common grantor has not been exercised. Anno., 19 A.L.R.2d 1274, 1282 (1951). Such is not the case in the restriction under consideration, however. There, it states: "Only single family dwellings shall be permitted, and not more than one such dwelling of a single story shall be constructed on any subdivision parcel without the written approval of the seller." That language, to our interpretation, does not endow the common grantor with freedom to waive any and all requirements at his sole discretion. Rather, it is more consistent with the view that the Seller's approval must be obtained to construct more than one such dwelling on any parcel, and possibly to build a home of more than one story. Mr. Evans testified that anyone building a home in the development was required to submit the plans to the corporation for approval prior to construction. We cannot find any justification for reading this provision,

373

by any remote potentiality, as authorizing a variance from *residential use*. In other words, we view this reservation as pertaining only to construction layout, not as to the use of the building. Competent legal authority supports this distinction:

If a general restriction as to the nature of buildings to be permitted on he [sic] land is coupled with a reservation by the grantor of the mere right to approve the plans of proposed buildings, this right being interpreted as a mere aid to the enforcement of the restrictions, a lot owner may usually enforce the restriction where the grantor's approval has not been given. 20 Am.Jur. Covenants, Etc. Section 179 (p. 742).

This reservation cannot, then, "negative the purpose of uniform development." Defendant cites several cases in which the reservation caused the court to nullify the restrictions altogether on the basis of lack of mutuality. We are of the opinion, however, that the scope of the discretion vested in Evans is so limited, that even its exercise would not result in a deviation from the essentially residential nature of the area.

. Covenants of the sort here involved, even when legally valid, are sometimes held non-enforceable where it is shown that the neighborhood has changed to such an extent that the original purpose behind the restriction can no longer be served. Defendant does in fact make such an argument, contending that "in the early 1960's and in 1966 when Lambert bought and Beatty bought and built, the area lay largely undeveloped. Now it has 170 plus condominiums, plans and approval for a 170-room hotel with restaurant facilities. Across the road from defendant, the developer admits it is zoned W-1 and is to be used for more tennis courts and resort cottages." (Brief for defendant, p. 8.) The zoning of the property "across the road" is irrelevant, because (a) the property in question is all zoned R-1; and (b) there is no proof that the property across the road is

subject to the same limitations as are plaintiff's and defendant's.

█ It is impossible to find any hard and fast rule as to what change in the character of a neighborhood is or is not sufficient to justify the non-enforcement of a restrictive covenant by a court of equity. The courts are candid in recognizing this case by case method, and often admit that it is difficult to reconcile different conclusions arising from almost identical fact patterns. 20 Am.Jur.2d Covenants, Conditions, Etc. Section 292 (p. 844). Nonetheless, there are certain basic rules which underlie the decision in any given case.

> The change of condition must be so great or so fundamental or radical as clearly to neutralize the benefits of the restriction to the point of defeating the purpose of the covenant, or must be so substantial as to support a finding that the usefulness of the covenant has been destroyed, or that the covenant has become valueless to the property of the plaintiffs and onerous to the property of the defendants. 20 Am.Jur.2d Section 282.

Thus, if there is still some benefit to be derived from the restriction, a court of equity will not easily set it aside. Id. This is the position taken also by the Restatement of Property. The standard set out in Section 564 is "if conditions have so changed since the making of the promise as to make it impossible longer to secure in a substantial degree the benefits intended to be secured by the performance of the promise." Comment c. of that section suggests that

> If it is still possible, despite a change in conditions, to secure the anticipated benefit in a substantial, though lessened degree, the change of conditions will not alone be sufficient to warrant the refusal of injunctive relief.

See also 3 Tiffany on Real Property Section 875 (pp 520–21).

█ In looking to the question of how much a neighborhood has changed, there is some disagreement in the courts

as to what property may be considered. Most courts restrict the inquiry to the particular properties which are similarly restricted. This is usually based on the theory that

[i]t is assumed that one purpose of the restriction was to guard against encroachment of external changes; certainly they were not intended to operate in the unrestricted area and consequently should not be affected by any changes occurring therein. 3 Tiffany on Real Property Section 875 (p. 522).

This concept was best described in the case of Flinkingshelt v. Johnson, 258 S.C. 77, 187 S.E.2d 233, 238 (1972):

It is obvious that any restricted area, whether it be residential or industrial, must have a demarcation line, it must end somewhere. Where the restricted area ends other unrestricted development will or may foreseeably occur. To hold that commercial development in an unrestricted area would allow the lifting of the residential restrictions as to property adjoining or in the vicinity of the restricted area, would be to expose all restrictions to eventual invalidity. It would remove the sanctity of longstanding, long respected contractual agreements and place them at the whim of parties not privy to the agreements.

The relevance of this distinction, between changes occurring within or without the boundaries of the restricted property, relates to the question of whether the Yacht Club and any other private club in the area are or were part of the same restricted property development. Mr. Evans stated that when the property on which the Yacht Club is located was withdrawn from the Trust, it was not encumbered by any of the restrictions placed on the residential lots. Moreover, even if it had been, defendant would be powerless to use it as an example, because when Mr. Beatty purchased his property in 1969, the Yacht Club had already been in that location for three years. In order to utilize the argument of a change in the character of the neighborhood, those changes must have occurred subsequent to the time plaintiff purchased his land. 20 Am.Jur.2d Covenants,

Conditions, Etc. Section 2812 (p. 846); Van Sant v. Rose, 260 Ill. 401, 103 N.E. 194 (1913).

Consistent with the Flinkingshelt opinion is Albino v. Pacific First Federal Savings & Loan Assn., 479 P.2d 760, 762 (Ore. 1971) ("It is not sufficient that there have been changes outside the restricted area, unless there have also been changes in the area itself . . ."); Tull v. Doctor's Building, Inc., 225 N.C. 23, 120 S.E.2d 817 (1961); Martin v. Cantrell, 225 S.C. 140, 81 S.E.2d 37 (1954).

As far as what kind of changes, in the cases, have been found to be sufficient to deny injunctive relief, the above noted observation of lack of consistency is well borne out. There are many cases in which apparently changed circumstances far greater than those urged here have been found insufficient to lift the restriction. Thus, in Western Land Co. v. Truskolaski, 495 P.2d 624 (Nev. 1972), the restrictions were found still valid and valuable despite the fact that the court found evidence that a huge, major traffic artery was built directly abutting the restricted area, bringing with it an increase in commercial activity which included, directly across from the subdivision, a restaurant and large shopping center. And in Cochran v. Long, 294 S.W.2d 503 (Ky. 1956), the court held that the evidence did not sustain a finding that construction of a major highway and ensuing transition to business of certain adjacent areas had made such a basic change in character as to cause the covenant to become inapplicable. It seems that the appearance of superhighways, large commercial buildings, shopping centers, and even rezoning of an area by the local government, have more often than not been found insufficient grounds to set aside a restrictive covenant if there is the least vestige of residential character left, even if it is reduced to the extent of a single block. Osborne v. Hewitt, 335 S.W.2d 922 (Ky. 1960). But cf.

Hecht v. Stephens, 204 Kan. 559, 464 P.2d 258 (1970); Thompson v. Borschach, 416 P.2d 898 (Okla. 1966).

It is instructive to note that at the time this area was originally developed, in the early 1960's, the land in question was zoned R-10, which permitted single or double-family dwellings. More recently, however, parcel No. 8 has been re-zoned R-1, the most exclusive category of residential zoning. While this observation is of no legal significance, it is indicative of the local government's recognition of the character of the area. Moreover, the fact that the adjoining property, which includes the Yacht Club, is zoned W-1 (light commercial), supports the conclusion that the zoning in the area follows the concept of the master plan in designating certain areas residential and others recreational.

■ If, as defendant asserts, the neighborhood has changed, then it is even more important that those areas devoted exclusively to costly private homes remain that way. There is still considerable benefit to be derived from the restrictive covenant, and we will not disturb it on the theory of change in the character of the neighborhood.

■ Another means by which defendant can avoid the covenant, also alleged, is the finding that other violations of the reciprocal covenants have been tolerated in the area so as to constitute and establish the defense of waiver and/or acquiescence. This is very closely related to the defense of changed circumstances, but is based on the acts, or more properly the failure to act, of the mutual covenantees rather than acts of some external party.

The grantee of a piece of property which is subject to such a common plan of restriction has occasionally been regarded as precluded from enjoining the violation of the restriction if he acquiesced in a violation thereof by another. 3 Tiffany on Real Property Section 874 (pp. 513–14).

Defendant has introduced into evidence photographs and brochures which it asserts demonstrate past violations of the restrictions. They are of several sorts. The first are brochures advertising resort activities and accommodations. Some of these were identified by Mr. Evans as being outside of the development, although nearby. (Exh. J and L.) Another brochure, put out about 1965 by Vessup Bay Estates, contains a map showing residential areas in parcels 5, 9 and 8, and is consistent with both the master plan and all the covenants. Another photograph offered by defendant as proof of a violation is of Evans' office. (Exh. H.) Evans testified that the office had been erected twelve years ago, before parcels five, eight and most of nine were developed. It is elementary that in order to constitute waiver, the improper use must have occurred after the acquisition by the complainant of his property; otherwise, he takes subject to and with full knowledge of the non-conforming structure.

Another area of claimed violation is with respect to the prohibition against buildings of more than one story. Many pictures were presented which seem to depict a bottom and top floor, thus apparent violations. I use the word apparent, however, because in peculiarly local terms these buildings do, in fact, constitute one-story homes. Because of the local terrain, most homes are built into the side of mountains. Added to this topographical problem is the fact that local law requires the construction of a cistern, which in most if not all cases forms the foundation on which the living quarters of the home are built. In instances where the cistern does not take up the entire area beneath the house, it is common custom and common sense to utilize the remaining portion underneath to some practical purpose. In most homes this is achieved by placing there laundry facilities, living quarters for domestic help, or simply a spare "guest room." Plaintiff himself has such an

arrangement in his home, the plans for which were approved, prior to construction as was necessary, by the very Seller who had placed the one-story covenant in the deed. Evans stated at the hearing that to his mind such a method of construction came within the definition of a one-story dwelling. I agree and conclude that the assertion that such constitutes a violation of the restriction is without merit.

■ The final type of violation urged by defendant is the allegation that many people in the area let out either portions or the entirety of their homes for rent, thus introducing a commercial element into the neighborhood contrary to the covenant, as well as violating the "single family" restriction. Defendant points to the fact that Evans himself had let out his "guest quarter" to one Sylvia Putziger, and that now his in-laws are staying there. The most damaging testimony to the plaintiff's position was that of Evans himself, when he stated that to his understanding, a property owner subject to the covenant could rent out a portion or the entirety of his home without Seller's approval and without violating the restriction. Although this would not be the Court's understanding of the covenant which Evans authored, neither can we say it is a violation of the sort that would justify non-enforcement in the instant case. It is neither of the same kind nor magnitude as that sought to be enjoined.

■ The law on the waiver of restrictions is quite clear, and the estoppel sometimes inferred from it is by no means absolute. There must be the conjunction of several elements. First, there is the matter of physical proximity of the violation to the property of the complainant. Thus, in Scott v. Armstrong, 330 Mich. 504, 47 N.W.2d 712 (1951), the Michigan Supreme Court declared that

Violations in other blocks and on other streets did not require plaintiffs to run to court to prevent them, or, for failure to do so, remain supine when other or nearer violations of the restrictions

threatened them with direct . . . injury. (Quoting with approval De Galan v. Barak, 223 Mich. 378, 382, 193 N.W. 812, 814.)

Another factor which should be considered is the extent to which the violations have been permitted. That is, whether they are only isolated incidents or oversights tantamount to abandonment of the restrictions. In Carey v. Lanhoff, 301 Mich. 168, 3 N.W.2d 67 (1942), defendant wanted to open a boarding house and claimed that other similarly restricted property owners had in the past done so. The court rejected defendant's contention, noting that although single rooms may have been sporadically let out, "such breaches have not resulted in a substantial, if not entire, change in the neighborhood." 3 N.W.2d at 70. Additional language used by that court is equally apposite to the case at bar:

[T]he neighborhood is still a high-class residential area. A substantial portion of the violations asserted by defendant are not of such character as to be at all conspicuous or readily ascertainable . . . claimed violations must be considered in determining whether the complaining property owners have waived or forfeited the benefit of a restriction. Id.

Similar sporadic and minor violations were rejected as insufficient in Western Land Co. v. Truskolaski, supra, (temporary use of a house as an office, temporary use of a house as a nursery for a baby-sitting service). The court there said:

In order for community violations to constitute abandonment, they must be so general as to frustrate the original purpose of the agreement. 495 P.2d at 628.

Hand in hand with the question of the extent of the previous violations is the question of the kind of violation previously tolerated. As put by the court in Carey v. Lanhoff, supra.

The fact is that the neighborhood still remains substantially residential. This justifies plaintiffs' contention that though some busi-

nesses admittedly have been established, these do not operate to preclude plaintiffs from seeking to enjoin the defendant from establishing a rooming and boarding house . . . or preventing plaintiffs from taking steps to check a further or a different violation. 3 N.W. at 70.

The policy behind such holdings is clearly to "protect property owners who have not themselves violated restrictions in the enjoyment of their homes and holdings, free from inroads by those who attempt to invade restricted residential districts and exploit them under some specious claim that others have violated the restrictions, or business necessities have nullified them." Swan v. Mitshkun, 207 Mich. 70, 76, 173 N.W. 529, 531 (1919).

The alleged violations raised by defendant, such as the occasional renting of rooms by homeowners in the area, or brochures advertising guest houses, are either sporadic occurrences, or not "conspicuous and readily ascertainable." The renting of a home, while peripherally commercial and questionably proper, still preserves the residential nature of the neighborhood. This must be juxtaposed to the anticipated effects of the operation of a private club, which would inevitably include much increased traffic, noise and possibly even pollution. Plaintiff, and many others similarly situated, have invested a great deal of time and money in their homes, and have relied on the covenants to ensure the continued tranquility and high standard of their neighborhood. The violations which have occurred can only be termed sporadic and isolated, and can hardly be considered tantamount to abandonment of the restrictions. They will not suffice to constitute as a matter of law or fact, waiver, acquiescence or abandonment by plaintiff or most of the other property holders in the area.[5]

---

[5] It should also be noted that Clause (1) of the restrictions provides:
The failure on the part of any of said parties at any time to enforce any of said covenants shall in no event be deemed to be a waiver thereof, or to

■ As a last-ditch effort, defendant urges that even if all plaintiff's arguments are sound, he is nonetheless still not entitled to the injunction because no harm, irreparable or otherwise, has been shown. This Court is not so convinced of the absence of proof of harm, but even if defendant's contention were correct, we are of the opinion that no harm need be shown in a case such as this. Although as a general rule one seeking an injunction must allege and prove irreparable harm, this appears not to be the case when the injunction is sought to enforce a restrictive covenant regarding land use.

As a general rule, a restrictive covenant may be enforced irrespective of the amount of damage which would result from the breach and even though there is no substantial monetary damage to the complainant by reason of the violation. The right to enjoin the breach of restrictive covenants does not depend upon whether the covenantee will be damaged by the breach; the mere breach is sufficient ground for interference by injunction. 20 Am.Jur.2d Covenants Etc. Section 314 (p. 879).

The reasoning behind this exception to the rule requiring a showing of irreparable harm in order to procure injunctive relief is based on the contractual nature of restrictive covenants. See, e.g., Reetz v. Ellis, 186 So.2d 915, 921 (Ala. 1966). In a very old case, Van Sant v. Rose, 260 Ill. 401, 103 N.E. 194 (1913), the defendant raised the defense that the plaintiff held no other land in the vicinity so she could not possibly be damaged by a violation of the covenant. Rejecting this argument, the court said:

The only purpose their having other land in the vicinity could serve would be to show that they would be injuriously affected—that is, damaged—by a violation of the contract. But as their right

be a waiver as to existing or future violations thereof.
Although we do not rule on the validity of this clause, or consider it vital to the findings made above, we call attention to it as further evidence of the plaintiff's justifiable reliance in the security provided by the covenant restricting proper use, even if he did not feel threatened by other, minor infractions.

does not necessarily depend upon their being damaged by the breach, it would seem it would not necessarily depend upon their owning other land in the vicinity. Bispham [Principles of Equity, 4th Ed.], in the paragraph above referred to, says it is no answer to an action of this kind to say the breach will inflict no injury upon the complainant, or even that it will be a positive benefit. 103 N.E. at 196.

Sheypardization of this case has not shown any retrenchment in this rule.

In Loeb v. Watkins, 428 Pa. 480, 240 A.2d 513 (1968), Justice Musmanno in the majority opinion stated:

> Restrictive covenants are enforceable without the necessity of showing that the enforcement would work a substantial gain to the legal beneficiary of the covenant. The plaintiff's rights here to enforce the restrictive covenant is absolute, regardless of proof that they do or do not suffer damage as a result of the breach of the covenant. 240 A.2d at 516.

Although the above holding was part of the majority opinion, this particular ruling was not concurred in by a majority of the Justices. Justices Roberts and O'Brien, concurring in the result but, disagreeing with the rule set out above, asserted without further discussion or citation, that they "concur in the result reached by the majority, but disagree with the view that equity should grant relief even in the absence of any substantial benefit to the plaintiffs." 240 A.2d at 516. And in his dissent, Justice Cohen said:

> The majority opinion prostitutes equity jurisdiction. As a general rule, *equity will not enforce a restrictive covenant which is of no benefit to the dominant tenement or is an absurd, futile, and ineffective attempt* to achieve a desired end. (Citations omitted.) Furthermore, equity will deny relief to a party seeking enforcement of a restrictive covenant if the harm done by granting the injunction will be disproportionate to the benefit secured thereby. . . . It is important to note that these equitable principles evolved from the legal maxim that restrictions on the use of the land are not favored by the law because they constitute an interference with the free use

and alienability of real property. 240 A.2d at 517 (emphasis supplied).

It is apparent that the reasoning behind the dissent in the Loeb case does not do injury to the position of our plaintiff: enforcement here would be neither absurd, futile nor ineffective. The Restatement of Property, Section 563, seems to lend weight to the position of the dissenters noted above, in that it explicitly condones a test of relative hardship in the award of injunctive relief "arising out of a promise respecting the use of land." The relative hardship test seems much akin to the balance of convenience theory which, according to 42 Am.Jur.2d Injunctions Section 56, cannot be applied unless the defendant offers proof that *he* will suffer irreparable harm if the injunction is issued. This view is elaborated in Section 56, where it is said "Certainly, the doctrine does not mean that substantial, certain, and irreparable damages to the complaining party which might be prevented by injunction are to be left without remedy because of the fact that greater damages would result to the defendant, a wrongdoer, by issuing the injunction." This interpretation is borne out by Comment C. of the Restatement of Property Section 563:

It is not sufficient to create the disproportion that will justify refusing to grant injunctive relief that the harm ensuing from granting such relief will be greater than the benefit gained thereby. When the disproportion between harm and benefit is the sole reason for refusing relief, the disproportion must be one of considerable magnitude.

Thus, although the Restatement seems to confer some authority for not making the mere breach sufficient to issue an injunction, it in a sense shifts the burden of showing irreparable harm from the plaintiff, as would be the case in an ordinary case for injunctive relief, to the defendant.

Defendant urges that, on the basis of the comparative hardship theory, it is entitled to prevail over plaintiff.

385

It claims that if injunctive relief is granted, it will lose its $230,000 investment in the property, and the attendant costs connected with the mortgage ($2,000 a month) and other financing, as well as its membership campaign expenses. We do not believe defendant can properly invoke the equity powers of this court on this or any other theory. When the corporation purchased the land from Lambert, it was fully aware of both the outright restriction contained in the covenant referred to in the deed, and the questionable propriety of locating a private club in an area zoned R-1. Since the defendant chose to gamble on either the passivity of the neighborhood residents, or his luck with the law, it cannot now come into court and plead a loss on its investment.

The great weight of the authority favors the position that mere breach of a restrictive covenant is sufficient, without a showing by plaintiff of irreparable injury, to warrant the issuance of an injunction. Although the Restatement seems to offer some leeway for the Court's exercise of discretion, that can occur only after the defendant has shown that its relative hardship under an injunction would be great. Defendant in this case has in no manner met this burden. Nor has it the "clean hands" with which to do so.

In sum, we conclude that defendant has failed to show any reason, factual or legal, sufficient to justify non-enforcement of the restrictive covenant contained in its deed. The development of parcel No. 8, Estate Nazareth, has proceeded both as a separate entity and in terms of the master plan, to take on the character of an exclusive residential nature. The non-residential uses, proposed and actual, are located in easily distinguishable lots, albeit nearby. In view of the phenomenal real estate expansion this island has seen in the past decade, and the inevitable necessity of spreading of non-residential uses, we are firmly

convinced that it is the right of the property owners who have relied on the covenants, now more than ever, to rigorously maintain the character of their neighborhood.

██ Plaintiff is entitled to the relief sought, and defendant JOHN C. CLARK, INC., will be permanently enjoined from operating the Sea Lord Club at and on Parcel No. 8 Estate Nazareth.