892 F.2d 245
 John E. MAITLAND and Myriad R. Maitland
v.
PELICAN BEACH PROPERTIES, INC., The St. Thomas Committee of
the Coastal Zone Management Commission, the Virgin
Islands Board of Land Use Appeal.
Francis J. McCARTHY
v.
PELICAN BEACH PROPERTIES, INC. and Virgin Islands Board of
Land Use Appeals.
Appeal of Francis J. McCARTHY, Jr.
 No. 88-3709.
 United States Court of Appeals,
Third Circuit.
 Argued April 26, 1989.
Decided Dec. 7, 1989.
 
 Henry L. Feuerzeig (argued), H.A. Curt Otto, Dudley, Topper and Feuerzeig, Charlotte Amalie, St. Thomas, U.S. Virgin Islands, for appellant.
 Winston A. Hodge (argued), Lisa Harris Moorhead, Winston A. Hodge, P.C., Christiansted, St. Croix, U.S. Virgin Islands, for appellee Pelican Beach Properties, Inc.
 Before HUTCHINSON, COWEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 This appeal arises out of a dispute between a land developer and several residents of certain beach-front properties in Smith Bay, St. Thomas, Virgin Islands.
 
 
 2
 The Coastal Zone Management Committee ("CZM") had granted a permit to Pelican Beach Properties, Inc. ("Pelican") to construct a sixty-unit "beach club" on property that is subject to a number of restrictive covenants. The Board of Land Use Appeals ("Board") in turn affirmed the permit grant. Despite the fact that the district court (Christian, J.) found a number of improprieties in the review process as conducted by the Board, the district court upheld the granting of the permit by the CZM based on its conviction that the CZM decision was supported by substantial evidence. John and Myriad Maitland and Francis McCarthy, Jr. ("McCarthy") appeal from that district court order.
 
 
 3
 Among other problems, this appeal involves the district court's failure to observe the structural hierarchy of fact finding and decision making mandated by the statutes of the Virgin Islands which authorized the establishment of the Coastal Zone Management Commission and the Board of Land Use Appeals. The district court, apparently in disregard of that structure, ignored the exclusive fact-finding responsibilities of the CZM by undertaking its own fact-finding ventures. It then ignored the Board's exclusive duty to review the CZM's findings, and, in an apparent attempt to make up for the deficiencies of both the CZM and the Board, the district court essentially usurped the province of each and of both. We reverse.
 
 I.
 A.
 
 4
 In 1957 Peter and Eleanor Maas ("Maas") sold parcels 11B and 12 to Pelican Beach, Inc. ("Old Pelican"--no relation to the appellee/defendant Pelican). The deed contained a covenant that expressly prohibited the construction of a "hotel or guesthouse" and permitted "residential use only" or "use by a first-class well conducted beach club or for the construction of attractive substantial rental cottages as residences."
 
 This "no-hotel" covenant stated that:
 
 5
 ... the land conveyed in this deed by the parties of the first part (Maas) to the party of the second part (Pelican, Inc.) shall not be sold at anytime by the party of the second part, its successors and assigns for hotel or guest house construction and may be sold only for residential use, or for use by a first-class, well conducted beach club, or for the construction of attractive substantial, rental cottages as residences, and the enforcement of this provision is considered of the utmost importance by the parties of the first part and of the essence in this deed, enforceable by injunction and other legal relief in its violation.
 
 
 6
 "Old Pelican" further subdivided and sold the property attaching further covenants restricting the land to "single-family" residences and prohibiting any beach or bathing operation for commercial purposes or for use by the general public.[1]
 
 
 7
 The "Old Pelican" Beach Club purchased 11-B and in the 1960s built "Old Pelican" on a portion of 11-B. It consisted of 23 units, comprised of 11 buildings, primarily of one-bedroom and two-bedroom cottages separated from each other. The remainder of parcel 11-B and parcel 12 were subdivided and sold. Each deed of sale was subject to the "no hotel" covenant and the "single family" and "beach club" covenants.
 
 
 8
 The club was open a few months of the year. There was parking for 20 cars. In keeping with the restrictions, the club did not solicit the patronage of the public at large, and owners of the residences that surrounded the club were barred from the club's premises absent permission. The deeds of the surrounding residential parcels provided that while the neighbors had a perpetual easement to the beach, they did not have the right to use the beach club facilities.
 
 
 9
 The Maitlands purchased parcel 11B-7 on November 13, 1979 (A52). The McCarthys purchased parcel 12D-2 on April 29, 1980 (A55).
 
 B.
 
 10
 In 1985 Robert Cummings, owner of "Old Pelican," sold the club and some adjacent parcels to appellee Pelican. Pelican proposed to tear down the "Old Pelican" Beach Club and build a 68-unit "Pelican Beach Hotel". This plan encountered opposition at the first public hearing on February 3, 1987 before the CZM. Subsequently, Pelican submitted a modified application in response to protests that the permit would violate certain restrictive covenants. The modified plan for a 66-unit beach club was then termed the "Pelican Beach Club" plan. Subsequently, as a result of opposition, the plan was again modified, this time to 60 units. Finally, the CZM conducted another public hearing and voted to grant Pelican a permit.
 
 
 11
 On June 25, 1987, the CZM published its decision with findings. It granted the permit for a 60-unit beach club consisting of 16 guest room buildings of no more than 5 units each, a main building including a lobby/reception area, a lounge, a dining area seating 120, and meeting rooms with a 100-seat capacity. The permit also approved a manager's residence and a reverse osmosis/sewage treatment/emergency power generator facility also housing electric and telephone switching equipment, laundry, office and storage spaces. (App. I 70-82)
 
 
 12
 On August 7, 1987, McCarthy filed an appeal with the Board. On October 20, 1987 the Board held a public hearing attended by all interested parties.
 
 
 13
 On October 28, 1987, the Board held an Executive Session meeting that was not attended by McCarthy, who had received no notice of the meeting, but which was attended by Winston Hodge, Pelican's counsel, and Robert deJongh, Pelican's architect. At the meeting ex parte material was submitted and arguments and comments were made by Pelican's representatives. At the conclusion of the meeting, the Board voted 4 to 1 to affirm the permit.
 
 
 14
 On December 14, 1987, the Board's written decision affirming the CZM was published. The Maitlands and McCarthy thereafter petitioned the district court for review of the Board decision. The district court consolidated the two cases. Accordingly, for ease of reference, throughout this opinion we will refer to McCarthy as the appellant.
 
 
 15
 The district court, on grounds which we find insupportable, affirmed the issuance of a permit to Pelican. It did so by an opinion filed on September 20, 1988, which we discuss below.
 
 II.
 
 16
 Given the somewhat singular statutory structure established for land use in the Virgin Islands, it will be helpful to recite not only our standard of review but the standard of review for each reviewing body. See Lavallee Northside Civic Association v. Virgin Islands Coastal Zone Management Commission, 866 F.2d 616, 619 (3d Cir.1989).
 
 
 17
 The standard by which the Board reviews CZM permit grants, such as the one at issue here, is found, (among other standards not relevant here) in 12 V.I.R. & R. § 914-3. The Board may review any decision in which the findings, inferences, conclusions, or decisions are:
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 c) made upon unlawful procedure;
 
 
 21
 d) affected by other error of law;
 
 
 22
 e) erroneous in view of the reliable, probative and substantial evidence of the whole record;
 
 
 23
 * * *
 
 
 24
 * * *
 
 
 25
 In reviewing a CZM determination under the "substantial evidence" standard, the Board is required to show great deference to the CZM's decision and uphold it if there is substantial evidence in the record to support the actual finding. Perry v. GESC, 18 V.I. 524, 527 (D.V.I.1981).
 
 
 26
 The district court, on the other hand, sits as an appellate court in reviewing cases from the Board. Consequently, the district court cannot find facts but rather reviews determinations of the Board to assure that it applied the correct standard. The district court also reviews the evidence the CZM had before it to be certain that substantial evidence supported the findings made and conclusions reached by the CZM. Conservation Society v. Board of Land Use Appeals, 21 V.I.R. 516, 519-20 (D.C.V.I.1985).
 
 
 27
 Our own review of the district court is plenary, since the decision of the district court from which this appeal is taken concerns legal interpretation, and the legal determinations of the district court as a reviewing tribunal are not shielded by any presumption of correctness. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir.1981).
 
 
 28
 With these standards of review in mind we now turn to the merits of the appeal.
 
 III.
 
 29
 On September 20, 1988 the district court affirmed the granting of the permit by the CZM since, in its opinion, the decision had rested on substantial evidence. (App. I-122). The district court took this action even though in the same opinion it reversed the decision of the Board, finding that the Board had violated McCarthy's due process rights.
 
 
 30
 The district court held that McCarthy had been denied due process before the Board because he had been given no notice of the Board's meeting at which the Board had considered ex parte information. The district court determined that Pelican had advanced ex parte "evidence" before the Board that had not been presented to the CZM. In doing so, the district court held that the Board's own rules and regulations, which confine its review to only that evidence presented to the CZM, 12 V.I.R. & R. § 914-2(f), had been violated when it heard ex parte "evidence" not presented to the CZM, and to which McCarthy was given no opportunity to respond.[2] See, Great Cruz Bay Dev. Co., Inc. v. V.I. Board of Land Use Appeals, 18 V.I. 536, 543 (D.C.V.I.1981) (inadequate record may violate due process).
 
 
 31
 Notwithstanding this conclusion, the district court then went on to hold that the decision of the CZM to grant the permit was supported by substantial evidence. The district court reasoned that, although, in construing the meaning of the "no hotel" covenant, the CZM had erroneously relied on the 1972 definition of "hotel" as defined in 29 V.I.C. § 225(b)(57) rather than relying on the zoning law definition in effect at the time of the drafting of the covenant in 1957, that error was harmless since both laws used substantially the same definition for hotel--a building with more than five (six or more) guest rooms. Therefore, the district court refused to disturb the CZM's determination that the structures proposed to be erected by Pelican would not constitute a "hotel" within the purview of the 1972 statute.
 
 
 32
 Moreover, the district court concluded that "Old Pelican" had itself been in violation of the land covenants and restrictions, albeit on a lesser scale. Based on this conclusion the district court reasoned that if "the very covenantor violated its own covenants, neither it nor its successors in interest should be heard to complain when others later 'follow suit.' " (App. I-124)
 
 
 33
 Finally, the district court held that the racial and anti-native motivations of the land covenants and restrictions were "transparent." Consequently, upholding these covenants and restrictions would be a "giant step backward" and would violate the declared public policy of 10 V.I.C. § 1 and 12 V.I.C. § 401. (AI-125).[3]
 
 
 34
 The McCarthy appeal followed, raising before us the same contentions urged before the district court.IV.
 
 A.
 
 35
 The first argument made by McCarthy on appeal charges that the Board of Land Use Appeals violated his due process rights and the CZM applied Virgin Islands law incorrectly. He further claims that the district court was required to remand the case to the Board for further proceedings. We agree.
 
 
 36
 In allowing ex parte information to be presented to its Executive Session of October 28, 1987, the Board committed two errors. First, it considered "evidence" that had not been presented before the CZM; and second, it failed to notify McCarthy of its Executive Session, at which it considered this ex parte "evidence," and thereby deprived McCarthy of any opportunity to respond to the new material introduced.
 
 
 37
 The district court recognized the flaws in the Board's proceedings and reversed the Board's decision. Had the district court remanded the matter to the Board at that stage, further error might have been avoided. That was not to be the case, however. The district court in effect substituted itself for the Board, and determined that, as an initial matter, it would decide if the grant of the permit by the CZM was supported by substantial evidence. In doing so, however, the district court took into consideration the ex parte information which the Board had invited and which was not part of the CZM record. It was the acceptance of this very information that caused the district court to reverse the Board. Thus, the district court proceeded well beyond determining whether substantial evidence supporting the CZM's findings and conclusion had been developed before the CZM.
 
 
 38
 We will not detail all of the information received and entertained at the Executive session of the Board. Suffice it to say that Pelican's architect spoke to the critical issues of density and design as well as to matters concerning alleged past and present breaches of the "no hotel,"[4] "beach club,"[5] and "single family"[6] covenants. Information was also solicited by the Board as to knowledge of neighbors residing in the area for which the permit was being sought, and as to whether their actions constituted a waiver of any of the covenants.
 
 
 39
 None of this ex parte information had been presented to the CZM at either of its public hearings, and many of the statements made to the Board are open to dispute. Indeed, in this appeal they are challenged strongly by McCarthy. More importantly, this information, on which the Board evidently relied in affirming the CZM, was presented after the record was closed and without McCarthy having been afforded an opportunity to respond.
 
 
 40
 Although the district court held that there had been a due process violation, it nonetheless went on to determine that the CZM decision of June 25, 1987 was founded on substantial evidence--a determination that finds no support in the record. Indeed, not only had the CZM committed error when it applied the 1972 zoning law instead of the 1957 zoning law, but the district court exacerbated the situation by imputing inferences to the CZM that the CZM had never drawn.
 
 
 41
 Without any analysis of the evidence that had been advanced before the CZM, the district court proceeded to make findings, among other things, on what "must have been on the minds of both the Committee and/or the Board." Thus, the district court concluded that the "racial and anti-native motivation" of the covenants was "transparent" and, therefore, the covenants were unenforceable in their entirety. (App. I-125) No evidence that could lead to any such finding or determination was ever introduced before the CZM and, accordingly, no finding or determination and no such conclusion was ever suggested by either the CZM or the Board. (App. I-70-85)
 
 
 42
 As McCarthy's brief observes (Appellant's Brief, at 19) fairness alone--to say nothing of due process considerations--required that McCarthy be given an opportunity to explain, refute or test the "evidence" presented against his position by Pelican's architect and counsel. Brown-Pacific-Maxon Company v. Toner, 255 F.2d 611 (7th Cir.1958). Unfortunately, because of the way in which the district court dealt with and resolved the permit issue, McCarthy was never afforded that opportunity before either the CZM or the Board. See, Rose Lees Hardy Home & School Assoc. v. District of Columbia Board of Zoning Adjustment, 324 A.2d 701 (D.C.Ct.App.1974).
 
 
 43
 Thus, even without more, the actions of the Board and then of the district court required remand of these proceedings first to the Board and then to the CZM. However, as McCarthy has pointed out on this appeal, there is more.
 
 B.
 
 44
 In reviewing the CZM decision, the district court also concluded that the CZM wrongly applied a 1972 law instead of the contemporaneous 1957 law in deciding if the new Pelican project qualified as a hotel. This determination alone was adequate to justify remand to the CZM. Instead, rather than directing a remand to the CZM for application of the correct law to the facts (i.e., the 1957 zoning law) the district court made its own unilateral determination that applying the incorrect 1972 zoning law was "harmless." It reached that conclusion by holding that both the 1957 and the 1972 laws defined the critical term "hotel" in the same manner. However, in comparing the definitions used in the two laws, the district court examined only the section of each statute that defined the term "hotel," 29 V.I.C. § 225(b)(57) and Act No. 273 § 33(j), 1957 Sess.L. 224. It ignored other applicable and essential provisions that defined terms within those definitions, such as the terms "building" and "club."
 
 
 45
 Pelican argued that the outcome would be identical under either law. The 1972 law, 29 V.I.C. § 225(b)(57), defined "hotel" as "any building containing more than five guest rooms...." The 1957 law, by contrast, defined "hotel" as "any building or portion thereof containing 6 or more guest rooms used, designated or intended to be used, let or hired out to be occupied, or which are occupied by 6 or more guests...." Now Pelican maintains that even under the 1957 definition, Old Pelican was a "hotel," while the new project, thanks to its architectural design, is not. (A III Tr. III 8, 32) In sum, Pelican argued it would serve no purpose to return this case to the CZM. Pelican contended that the district court was right to conclude the error was harmless, given the similarity of the statutes.
 
 
 46
 McCarthy, on the other hand, effectively demonstrated that the 1972 act was not only erroneously applied but was also, in fact, inappropriately advantageous to Pelican. McCarthy's argument emphasized the term "building" as it was used in the 1957 law. By ignoring the appropriate meaning of this term as construed in the 1957 law, the district court failed to consider an important distinction between the two laws. Under the 1957 law, a building with more than 6 units would constitute a hotel and would therefore preclude construction of the multi-unit "clusters" (60 units, see note 8, infra) proposed by Pelican. However, the term "building" in the 1972 statute is defined in terms of "separation," to wit:
 
 
 47
 (19) Building. Any structure having a roof, supported by columns or by walls and intended for the shelter, housing or enclosure of any person, animal or goods. When any portion thereof is completely separated from every other portion by masonry or a fire wall without any window, which wall extends from the ground to the roof, then such portion shall be deemed to be a separate building. (emphasis added)
 
 
 48
 McCarthy argued that Pelican took advantage of the particular semantics of the 1972 statute to construct "separations" that in turn produced "buildings" with no more than five units each, thereby creating a "no-hotel" loophole for itself. Hence, application of the 1957 law was not only critical, but as the district court itself acknowledged, that law which was in existence contemporaneously with the "no hotel" covenant was the only legally appropriate legislative enactment to enforce. (A I-122). Accordingly, application of the 1972 zoning act instead of the correct 1957 act cannot be classed as harmless error.
 
 
 49
 Much the same may be said in regard to the definition of the term "club." Under the 1957 law, a "club" is defined as a non-business entity. The definition reads: "All clubs except those, the chief activity of which is a service customarily [sic] carried on as a business." Act. No. 273, § 33(1) 1957 Sess.L. 224. Thus, a service activity carried on as a business is not a "club." Therefore, in terms of the "beach club" covenant,[7] which does not permit any beach operation for a fee, it would appear that the new Pelican project, designed as a venture for profit, would violate the "beach club" covenant.
 
 
 50
 McCarthy has also argued that new Pelican violates the medium density residential zoning (R-3) in which it is proposed to be located. McCarthy calls our attention to the activities permitted in an R-3 zone. Among the activities permitted are country, golf, and yacht clubs, but beach clubs operated for a profit are not included. In this connection, McCarthy reminds us that "[z]oning ordinances at variance with covenants do not modify or supercede the covenant restrictions." Bachman v. Hecht, 659 F.Supp. 308, 315 (D.V.I.1986).
 
 
 51
 We obviously do not undertake to decide the issues of breach of covenants or breach of zoning ordinances inasmuch as these issues are fact sensitive and are more appropriately to be decided by the fact finder. We have noted the arguments, however, because these issues will undoubtedly be pressed before the CZM and must therefore be considered by it on the record to be developed on remand.
 
 C.
 
 52
 The district court also engaged in unwarranted de novo fact finding leading to its holding that the "Old Pelican" violated the "no hotel" covenant. The district court concluded that, though smaller than the proposed new Pelican project, the "Old Pelican" had all along violated the "no hotel" covenant. It found that "Old Pelican" had advertised and operated as a tourist oriented club. The district court also found it to be no coincidence, that the months of the year during which "Old Pelican" was open, coincided with the St. Thomas tourist season. (A 123-25) Indeed, not only were no findings made by the CZM that the "Old Pelican" operated a "hotel," but the evidence bearing on this issue controverted the district court's "judicial notice" of such an operation.
 
 
 53
 Both Frank Davis, a resident of the Virgin Islands who had himself at one time managed the "Old Pelican" and Frank Kay, an owner of property adjacent to "Old Pelican," testified that "Old Pelican's" activities were extremely restricted. In order to have a reservation accepted at the dining room, for example, a non-resident would have to be endorsed by two former guests. Even adjoining property owners could not dine at the "Old Pelican" unless invited by registered guests.
 
 
 54
 Nor could the general public use any of the facilities unless a registered guest extended the invitation. Kay testified in addition that "Old Pelican" was open only during the season and there was "[n]o advertising, not even a sign on the main road except for a concrete pelican on the rock post." Kay had personally seen a "members only" sign posted in years past; and dinner at the "Old Pelican" was available only to registered persons. Thus, the record before the CZM is barren of any evidence, and therefore necessarily of any finding, that the "Old Pelican" had violated any of the restrictive covenants.
 
 
 55
 But even if we were to accept the argument that "Old Pelican" had been in violation of the hotel or beach covenants, the record is devoid of any evidence that McCarthy knew of such violations. Moreover, McCarthy could have waived the "no hotel" covenant or been estopped from enforcing it only to the extent of "Old Pelican's" violation. On this record, it is difficult for us to understand how, if McCarthy indeed had known about and tolerated the "Old Pelican's" breach, he could by that action have been deemed to waive or be estopped from enforcing the land restrictions against a much larger and different structure catering to transients. New Pelican, as we noted earlier, is projected to be a 60-unit facility with a dining area for 120 and meeting rooms with a capacity of 100 seats, to say nothing of the extensive ancillary operations required to conduct this type of establishment.[8]
 
 
 56
 Hence, this record cannot support findings of waiver or estoppel, even if such findings had been made, and they were not. This being so, we know of no theory on which McCarthy could be prevented from enforcing the land covenants against others, including the proposed new Pelican.[9]
 
 D.
 
 57
 Finally, the district court, without any citation to the record, and, more importantly, without any reference to any evidence on which its independent findings could rest, found that the covenants on which McCarthy relies were discriminatory. It held that the racial and anti-native motivation of the covenants was "transparent." In so holding, the district court stated that the covenants (see note 1 supra ) were in violation of public policy and therefore McCarthy could not enforce the land restrictions.
 
 
 58
 As we have observed, the record affords no basis for the district court to have concluded that these covenants were a subterfuge for racial and discriminatory exclusion. Despite the lack of evidence supporting its conclusions, the district court, quoting from the covenants, called attention to provisions such as "first class" and "residential character," which it termed "weasel words" and held that on their face they were racially motivated and therefore violated the Virgin Island statutes that proscribe racial discrimination and provide for opening the beaches and shores to all. 10 V.I.C. § 1 and 12 V.I.C. § 401. (A I-124-25).
 
 
 59
 In other words, covenants on their face designed to provide residential exclusivity were instead interpreted by the district court, with no evidentiary basis, as a surrogate for racial exclusion. The evidence on record in fact demonstrates otherwise. Thus, the "beach club" covenant[10] denied access to all members of the public, whatever their race or creed, on a non-discriminatory basis. Moreover, the only evidence before the CZM concerning the refusal to admit patrons to the "Old Pelican" facility involved "Old Pelican's" refusal to permit admission to several of the club's neighbors, all of whom were Caucasian. (App. II-Tr. I-69, 97).
 
 
 60
 On appeal, new Pelican, in an attempt to support the district court's finding that the covenants were discriminatory in nature, referred to a 1977 opinion letter from the Virgin Islands Attorney General's Office. That letter was captioned "Distinction Between Private Club and Place of Public Accommodation", 8 V.I. Op. A.G. 44 (1977)[11] and warned "Old Pelican" against discriminatory practices. We read the letter opinion in question as McCarthy has read it, namely that it concerned solely the issue of whether the Old Beach Club was a private club or a place of public accommodation within the meaning of the V.I. Public Accommodations Law 10 V.I.C. §§ 2-3.[12] It is plain from its text that nothing in the Attorney General's opinion letter charged "Old Pelican" with racial discrimination, or, in any other manner, lent legitimacy to a construction of the land covenants as being in violation of Virgin Islands laws against discrimination. Furthermore, insofar as portions of any of the restrictive covenants may no longer be enforceable (e.g., the "beach club" covenant in light of the Open Shorelines Act),[13] those clauses may nevertheless be severed so as to justify enforcement of clauses that are legitimate. Hawthorne, 268 S.E.2d at 500.
 
 
 61
 Absent evidence in the record before the CZM of racial or other discrimination, the district court could not fashion findings of discriminatory intent as it did. Nor could it have concluded simply that "the innocent must pay for the guilty." (A I-125). It is for the parties, if they so desire, to urge such issues and to present evidence on such matters to the CZM.
 
 V.
 
 62
 We will vacate the order of the district court dated September 20, 1988, thereby vacating as well the permit (CZT-13-87L) granted by the CZM to Pelican Beach Properties, Inc. We will therefore remand to the Board of Land Use Appeals with the direction that the Board in turn remand to the CZM for proceedings consistent with the foregoing opinion.
 
 
 63
 Costs will be taxed in favor of the appellant McCarthy.
 
 
 
 [1]
 The "single-family" residence covenant reads as follows:
 No structure other than a one-family residence, together with the customary appurtenances, (guest house, garage, cabana, servant's quarters, if any) shall be erected upon the parcel of land herein described.... No such residence or appurtenances shall be used as a commercial guest house or other commercial rental purposes. Nothing herein contained shall prevent the owner from renting the residence together with appurtenances as a one-family dwelling.
 This covenant applies to subdivisions 11B-1 through 11B-12 and 12A through 12E.
 The "beach-club" covenant which applies to subpart 11B-1 and 11B-4 through 11B-7 provided that:
 No beach or bathing operation shall be conducted on that part of St. John's Bay and Beach owned by the party of the first part, as more particularly described in Public Works Drawing C3-92-T57 dated November 22, 1957, of a public nature which would permit the general use of said facilities for a fee or a per diem basis, it being the intention of the party of the first part to maintain such operation in a manner in keeping with the residential character of the land being sold in this area; provided that a beach or bathing operation may be conducted in said area restricted to bona fide members or renters of cottages in said area, their families and house guests, together with such other persons as may be selected by party of the first part in keeping with the intentions herein expressed.
 The Maitlands concede that the "beach club" covenant may violate the Virgin Islands Civil Rights Statute, 10 V.I.C. § 1 and the Open Shoreline Act of 1971, 12 V.I.C. § 401. Those statutes are designed to afford all persons in the Virgin Islands with equal rights and with access to the beaches and shores. To the extent that the covenants would restrict beach access to only residents in the area, McCarthy argues that the language of the covenant that precludes general access should be severed. This severance, he asserts, would preserve the covenant's legitimate purpose of maintaining a single family residential area while still serving the purposes of the legislation affording public access.
 
 
 [2]
 The district court concluded that the ex parte evidence "was not such as would be open to reasonable dispute." (A I-121)
 
 
 [3]
 See note 1, supra
 
 
 [4]
 See p. 248 supra for the text of the "no hotel" covenant
 
 
 [5]
 See note 1 supra for the text of the "beach club" covenant
 
 
 [6]
 See note 1 supra for the text of the "single-family" covenant
 
 
 [7]
 See, note 1, supra
 
 
 [8]
 The scope of the permit granted would allow:
 the construction of a 60-unit beach club consisting of sixteen (16) buildings with no more than five (5) units each; one main building with a lobby/reception area, a lounge, a 120-seat dining area and meeting rooms with a 100-seat capacity; a manager's residence and a reverse osmosis/sewage treatment/emergency power generator facility ... laundry, office and storage space and related accessories ... [along with] 91 parking spaces. App. I-88, 92.
 
 
 [9]
 McCarthy has also argued that a tolerated minor breach, if indeed such a breach occurred and was known, does not permit a more substantial or more serious breach. James v. Roberts, 16 V.I. 272 (Terr.Ct.1979); Beatty v. Clark, 11 V.I. 366, 377 (D.V.I.1975); Hawthorne v. Realty Syndicate Inc., 268 S.E.2d 494, 499, 300 N.C. 660 (1980). Essentially, a residential covenant merits enforcement "if there is the least vestige of residential character left." Beatty v. Clark, 11 V.I. 366, 377 (D.V.I.1975)
 
 
 [10]
 See note 1, supra
 
 
 [11]
 The pertinent part of the Attorney General's Opinion Letter read as follows:
 Our investigation reveals that you are not a private club, but are in fact a profit corporation. You have no membership fees, bylaws or constitution....
 By definition as set forth in the ... law you are a place of public accommodation....
 ... 10 V.I.C. § 3(d) provides that no person, being the owner, provider ... agent or employee of any place of public accommodation, resort or amusement shall [by any means] withhold from or deny to any other person any of the accommodations, advantages, facilities or privileges thereof....
 You are hereby advised to cease and desist immediately ... all discriminatory practices....
 
 
 [12]
 10 V.I.C. § 2 defines public accommodation as:
 any place where food or drink is sold or rooms rented, or charges made for admission or service, or occupancy or use made of any property or facilities, including but not limited to inns and hotels.
 
 
 [10]
 V.I.C. § 3 provides that:
 All natural persons within the jurisdiction of the Virgin Islands, without regard to race, creed, color or national origin ... are entitled to ... (2) The full and equal accommodations, advantages, facilities, and privileges of any place of public accommodation, resort, or amusement.
 
 
 [13]
 See note 1 supra