[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I
Plaintiffs allege that on June 20, 1986, defendant sought a zoning variance to reduce the sum of setbacks and to enlarge an existing nonconforming structure. The Zoning Board of Appeals of Fairfield (ZBA), after hearing, granted conditionally defendant's application on five conditions, one of which is of significance in the present case, viz: the "house to stay within the footprint" of the existing structure. Plaintiffs contend the new dwelling is not "within the footprint." On complaint of plaintiffs to town zoning enforcement officer, the latter refused to act. Plaintiffs claim the ZBA illegally issued a certification of zoning compliance even though it did not meet CT Page 4595 the "footprint" requirement.
Plaintiffs claim irreparable injury and no adequate legal recourse, e.g., obstruction of view towards waters of Long Island Sound; disturbance of their peace, quiet and comfort and impairment of the value of their premises.
Plaintiffs seek relief against defendant's violating and exceeding the use allowed by the ZBA. The main issues in this case are whether defendant has or has not complied with the ZBA's decision granting a conditional zoning variance and, if not, to what relief are the respective plaintiffs entitled. Defendant's original cottage is described on the top of the second page of Ex. W as follows: "The [defendant's] project involves the removal of approximately a 21 x 44 foot one and one-half story structure and the construction on the same footprint of a two and one-half story single-family residence."
 II
The town zoning regulations provide in the definition section, 31.1, that "words used in these [zoning] regulations shall have `the meaning commonly attributed to them.'" The regulations contain no definition of the words "footprint" or "house." Nevertheless, it is within the court's province to use the language of 31.1 to determine the meanings of both words "commonly attributed to them," as it will do in this memorandum.
A comment on some of the more important exhibits preliminarily may be of some assistance to all concerned in following this memorandum as they will be referred to throughout this memorandum.
Exhibit C, photo, shows a portion of the front end and one side of defendant's cottage before it was demolished. Exhibit B, photo, shows the defendant's old cottage looking at it from the beach as it appeared before demolition, situated between plaintiff Simko's house to the right as you look at the photograph and plaintiff Varga's house on its left. Exhibit QQ looks at the rear of the old cottage and one side of the old cottage before demolition. Exhibit E, photo, is a clear view of the front footprint of the original structure, showing that and a portion of the left side of that structure's footprint with what looks like either a long piece of concrete running from cinder blocks towards the front footprint. Exhibit E is dated CT Page 4596 July 10, 1988. It is obvious from Ex. F that new construction work has occurred since demolition of the original structure. The concrete block pillar shown on the right side of the photo is, for example, much higher than the one shown in Ex. UU. Furthermore, the concrete block wall shown just to the left of center of the photo is all new construction as are the nine, round concrete pillars embedded in the ground beyond the new concrete wall. Compare this new wall with Exs. UU, June 4, 1988, and E (June 4, 1988). Moreover, Ex. F indicates new construction has gone considerably beyond the front footprint of the original structure.
Ex. UU, photo, shows the entire footprint of the original structure on all sides as of June 4, 1988, but with what appears to be gaps in the concrete blocks on the north and east sides which were not there when one compares the most important photos, Exs. QQ, OO and C, showing these two walls straight across with no breaks.
Exhibit D, photo taken June 4, 1988, shows the rear footprint of the original structure with its cinder blocks and a portion of the left and right sides of the old cottage footprints of that structure separated by a large gap on the rear wall indicating some alterations have been made after demolition of the old cottage. The same is true of a small gap in the middle portion of the east footprint. These gaps in the footprints can also be seen in Ex. PP taken on June 10, 1988.
The rear of the new building is shown in Exhibit TT while the addition beyond the rear footprint was being constructed. It is manifest that a comparison of the rear line of the original structure shown in Exhibit QQ with that of the rear protrusion addition shown in Exhibits TT, U and V establishes the latter as being clearly beyond the footprint to the rear line of the original structure.
 III
The defendant applied for a zoning variance on June 20, 1986. His application sought to remove a "one and one-half (sic) story structure" and the construction on the same footprint of a two and one-half story, single family residence. (See Exhibit W.) According to Ex. W, page 2, the old cottage to be removed was 21 x 44 feet in size. The defendant proposed to build a new two and one half story structure "on the same CT Page 4597 footprint." As one examines Exhibit QQ, it seems reasonably clear that the original structure was only one story high and not one and one-half stories. Furthermore, Exhibit X and Exhibit 1, dated June 10, 1986, misrepresent the existence of a building projection at the rear of the original structure which is disproved by Ex. QQ. It clearly was not there on that date or thereafter as far as the original structure is concerned. Exhibit Z also misrepresents the facts as they were in 1986 for the same reason. It would also appear that a handwritten notation at the front of "Mildoon" (the original structure) indicates a two story porch and deck to be within the footprint of "Mildoon." This, too, is inaccurate and misrepresents the actual facts in 1986.
In Exhibit DD, Mr. Fray, representing the defendant before the ZBA referred to "the same footprint, and that is the important thing. It will be on the same footprint as is currently there now." In the same exhibit on page 7, Mr. Fray, for the defendant, stated "the exterior walls will still lay on the existing foundation." The defendant himself, at page 8 of Exhibit DD, addressing the ZBA, referred to using "the same footprint" and "I am not enlarging the footprint" on pages 9-10 of Exhibit DD. The truth of the matter is defendant did not erect the new structure entirely on the old footprint as required by the ZBA's decision.[1]
On August 1, 1986, the ZBA granted conditionally a zoning variance containing the following condition was one of five conditions) in its "Notice of Decision" (Exhibit BB):
"House to stay within the footprint."
Exhibit CC, a "Notice of Filing," signed by the clerk of the ZBA, was received for record on January 28, 1987. It repeats the language of Exhibit BB, except for the six months requirement for zoning compliance.
The defendant's original structure in 1986 did not contain a porch or similar structure extending beyond the front of the cottage when defendant filed his application for variance, and none of them therefore was within the footprint of the original structure. No protrusion existed on the rear wall and no porches extended beyond the front of the old cottage. A witness, Frank Michno, testified that "footprint," as it is used in the building industry in which he had considerable experience CT Page 4598 constructing houses, defines the boundaries of a building that are left after the building is removed. Mr. Joseph Mesarich, many years a zoning official of the City of Bridgeport, confirmed that the front porches on the new structure were not within the original footprint. The court agrees with the testimony of both witnesses and finds the facts in accordance with their testimony.
In interpreting "footprint," the court cannot give weight to defendant's ad hominem effort to frame the language of a letter he wrote to to Mr. Gumpper, Chairman of the ZBA, dated September 30, 1986 (Ex. FF) requesting his signature. After some "understanding" the defendant claims the zoning enforcement officer expressed to defendant that the "decks are not technically part of the `house.'" In defendant's letter (Ex. FF), defendant appended space and language as follows under defendant's signature and space for Mr. Gumpper's signature:
 "The above is hereby confirmed this 10/2/86. (signed) Kevin J. Gumpper Chairman"
Ex. FF was composed by defendant for the express purpose of steering the chairman to consent to the concept that the "decks" do not have to be within the "footprint" of the original structure. Defendant failed to send a copy of Ex. FF to plaintiffs. This was manifestly an ex parte private correspondence between the chairman and himself to the exclusion of the plaintiffs. The court infers from its composition that it was designed to urge Mr. Gumpper solely in one direction, i.e., to favor the defendant.
This kind of of contact between defendant and Mr. Gumpper and the zoning enforcement officer was an improper means of seeking to enlarge or "clarify" the ZBA decision in Ex. BB without a duly noticed public hearing on a new application for variance where all interested parties could be heard. See Smith v. F. W. Woolworth, 142 Conn. 88, 91. Certainly the ZBA's decision (Ex. BB) made no mention whatever of "decks" or porches. It limited itself strictly to the "footprint" of the original structure (21 x 44 feet) as it was in 1986 at the time of defendant's application. To contend that the new concrete pillars embedded in the ground outside of the "footprint" of the original structure are still a part of that "footprint" is impossible to be legally justified. They are not within the CT Page 4599 footprint of the original structure. The porches are part of the house, made for the use of the house's inhabitants, and cannot reasonably be considered separate and apart from the house. They must therefore be restricted to the "footprint" of the original structure as part of the house, as the original structure appeared in 1986.
The public and other interested parties are still entitled to accept the application of those who seek variances for what the application states. In this case the defendant's application did not mention any "deck" to be constructed beyond the "footprint" of the structure as it existed at the time of the application in 1986. (Ex. W.) On the second page of the note attached to the application it states only: "It is anticipated that an approximate 8 x 16 foot deck will be constructed on the floor facing Long Island Sound." But the sentence immediately before it speaks of "construction on the same footprint" of the original one and one-half story structure. (Actually, as indicated from the photographs in evidence, the latter structure appears to be a one story cottage.) In addition, nothing in the defendant's application for a variance sets out any claim of "exceptional or unusual hardship. "[2]
The court finds that a reasonable person, reading the ZBA's decision (Ex. BB) and the language of the defendant's application, would interpret "footprint" as the court has stated its meaning previously and will discuss it further below. When the zoning enforcement official "approved an application for certificate of zoning compliance" which states that "2 sty. 1 family 44' x 21' — 4' x 10' dwelling, 12' x 21' open porch, deck and chimney, all on existing foundations," (emphasis added) not only is the description of the structures inaccurate, but it clearly misrepresents the facts that they are "all on existing foundations" because they are not. (See Ex. LL-2.) This interpretation by the court is substantiated by an experienced builder and an experienced retired zoning enforcement officer of the City of Bridgeport and is, without doubt, the most reasonable interpretation that applies in this case.
For the reasons indicated, it is only fair to conclude that defendant has built portions of the new structure without adhering entirely to the "footprint" of the 1986 structure. The front porches, including the roof over them, both first and second floors, is beyond that footprint as is the projection on CT Page 4600 the rear wall of the new structure. An examination of Ex. QQ demonstrates clearly that the rear wall of the original structure in 1986 was straight across with no projecting portion of the building. Thus, the substantial rear projection shown in Exs. TT, U and V of the new structure is in clear violation of the "footprint" condition prescribed by the ZBA. Further, the unscaled surveys such as Ex. X and Z are an inaccurate representation of the rear wall of the original structure as shown by Ex. QQ. No surveyor testified to justify this inaccurate representation of the rear wall on the 1986 original structure. In addition, Ex. X shows two "decks" (first and second floors) and steps on the front of "Mildoon," which did not exist in 1986, the date shown on the survey. Ex. Z is confusing and contains writing on it not established as to the time it was placed there or by whom. Neither survey, therefore, deserves much credibility. Add to these inaccuracies, Ex. 2, dated June 11, 1986, a rough sketch prepared by an architect (not a surveyor), purports to show a rear wall projection as "approximate existing conditions" on the date indicated. Obviously, no such projection existed in 1986, and this architect was drawing something he never saw on the site.
Furthermore, a "deck" as defined by Webster's Third New International Dictionary, 2f, reads: "a flat floored roofless area adjoining a house or built as a structural part of it. . ." (Emphasis added.) The front porches with roofs over them are not "decks." Webster, supra, id., describes a "porch" as "a covered entrance to a building usually with a separate roof and often large enough to serve as an outdoor seating or walking area." In addition, the court must keep in mind that defendant in his testimony conceded that the front porches are outside of the footprint of the old cottage. Moreover, defendant testified that the furnace in 1986 was within the original structure's footprint, but with the new two story projection on the new rear wall, the furnace is outside that original footprint and is located in the new 4 foot by 10 foot plus projecting structure. The court finds that the new front porches and the rear protrusion are built outside the footprint of the old cottage.
Defendant's reference to Zoning Regulation 31.1 for interpretation of language lends no particular assistance to defendant because its provisions deal solely with "[T]he words used in these regulations" (emphasis added); but even if we assume that this section does apply, only the Town Planning 
Zoning Commission, not the Zoning Board of Appeals, could CT Page 4601 determine the precise meaning of words used in the Regulations, and that Commission has not acted in this case. Furthermore, even if we apply this rule of construction, the court finds that the word "footprint" as used in this case by the Zoning Board of Appeals has "the meaning commonly attributed" to it, the exact area of the foundation of the original structure as it existed in 1986. This is clearly the interpretation any reasonable person reading the Board's order would assign to it. This would include, naturally, porches attached to the new structure for the use of persons occupying it. The entire new structure, including porches and the rear protrusion, had to remain within the confines of the original structure's footprint as it was in 1986. The defendant testified they were not within the footprint and the court so finds.
It appears to the court that many of the exhibits with the various inaccuracies depicted upon them, obviously known to defendant, could only serve to confuse and mislead the ZBA as to what was and was not on the defendant's site in 1986 when defendant's application was filed. The entire new structure including the porches and furnace room had to remain within the confines of the original cottage's footprint as it was in 1986.
The court finds that when defendant applied or a certificate of zoning compliance on March 4, 1988 (Ex. LL-1) the description of the new structure in the printed box headed "Proposed Buildings" includes the two story building height, the "Dimensions of Building," the "Ground Floor Area 1-12' x 21 open porches, 1-8 x 21 open porch," "Total Floor Area — Deck and Chimney," "Number of Stories — all on existing foundations." (Emphasis added.) The handwritten answers appear to be those of the defendant. It is, of course, significant that defendant, in giving the last quoted answer, recognized that the open porches as well as the main new structure were supposedly "all on the existing foundations" when in fact the open porches were not on the existing foundations, viz., the "footprint." This statement on Ex. LL-1, to say the least, is inaccurate and misleading, but nevertheless, it is clearly open to be considered as an admission against interest by defendant that the "decks" had to be "on existing foundations" to comply with the zoning board's order.
The court has observed that "house" and "footprint" are not words defined in the zoning regulations. Therefore, the court must determine their meaning in this case as that meaning is CT Page 4602 "commonly attributed to them," keeping in mind the caution set forth in 83 Am. Jur.2d Zoning Planning Variances, 829:
 "Grant of a variance is not a legal right and the language of a variance will be construed against the party seeking it."
The court has indicated that a "house" in the minds of most reasonable persons is what they observe of structures generally found on the residential streets of a community. They look at a building with a porch and consider the whole structure to be a "house." The porch is not separate and apart from the main building; it is attached to it. While persons may not conduct all of their normal living routines on a porch, nevertheless it is still part of the whole. It contributes to the life and style of living or those who occupy that building and use that porch. In a recent issue of either Newsweek or U.S. News and World Report, Vice President Gore refused to move into the Vice Presidential house in Washington because the porch had been badly eaten by termites and he wanted it repaired before occupying the house. This will delay moving in for about a month. The porch in his judgment is manifestly an integral part of the house.
There are two cases dealing with the word "footprint" of buildings which the court should mention and which corroborate the court's interpretation of it. See, for example, Fitzsimonds v. Board of Appeals of Chatham, (Mags. App. 1985)484 N.E.2d 113, 115: City of Belleair Beach v. Belleair Beach Yacht Club, (Dist.Ct. of App., Fla., 1989) 551 So.2d 530, 532, (Club was not limited to the "footprint" of previous buildings which were only "army huts"). In the latter case a previous owner negotiated an agreement with defendant to remove his old buildings and allowed him in the future to build "replacement structures not inconsistent with the present uses." The previous owner's buildings were similar to "army huts" with a yacht club which, under special regulation, was recognized as a nonconforming use. The trial and appellate courts ruled that "the new owner [plaintiff] is not limited to constructing these [new] buildings to be a `footprint' of the previous buildings, which were in the nature of `army huts.'" But rebuilding was limited to "replacement structures" (which phrase was not defined), but "obviously seeks to limit construction of the buildings to the same size as the previously existing buildings." (P. 532) The court affirmed in part and reversed in CT Page 4603 part and remanded to clarify the order to state the number of buildings and square footage to be constructed.
As for the word "footprint," as used in this case, it can only mean the print left by the old structure after it was removed. Here it refers to the cottage as it existed in 1986. Ex. QQ shows the rear wall running straight across with no breaks or gaps in it. Therefore, it is fair to infer that the footprint supporting that wall was cement blocks similar to those beneath all of the other walls of the old cottage. Some of these cement blocks of the old building are partially visible in Ex. UU and PP, but one must keep in mind that some of these blocks were removed on the rear wall footprint when the photos were taken and, therefore, do not represent the full footprint of that rear wall. Ex. QQ establishes this fact as to the rear wall.
In Fitzsimonds, plaintiffs bought a cottage they were renting. By deed, plaintiffs secured title to the one-story, single family, frame structure and its underlying land (the "footprint") plus a ten per cent undivided interest in the "common areas" shared with the similar units of the "cottage colony." All units by deed were limited to vacation use and not as permanent residences. Plaintiff's house was nonconforming. In 1980, under a building inspector's permit to add a livable second story, the plaintiffs completed 80-90 per cent of the work on the second story at a cost of $6,105.00 when a stop work order was issued on a neighbor's complaint. Superior Court upheld defendant Board's denial of a special permit for which plaintiffs applied after work stoppage. The court said that a single family structure "ordinarily assumes ownership of some verge of land with definite bounds, beyond the footprint . . . ." (Emphasis added.)
In Belleair Beach, the court distinguished between "footprints" of the previous "army huts" and the "replacement structures" which were to equal the overall size in square footage of the previous huts. In Fitzsimonds, the court distinguishes between the "footprint" of the cottage itself and the verge of land surrounding it which is not part of the "footprint".
The attempted use of the word "foundation" in place of "footprint" does not change the facts of the case and cannot in this case be accepted as a differentiation. The representation CT Page 4604 in the typed addition attached to Ex. W that a "concrete foundation presently exists, including an approximate 4 x 10 foot cement block area on the north side for entry underneath the present (old) residence for utilities" is a clear misrepresentation of what existed in 1986. Exhibit QQ shows the rear wall of the old cottage, and there is no "foundation" or "footprint" supporting any projecting rectangular structure. Furthermore, the court finds from its view of the premises and the evidence in the case that there never was any "4 x 10 foot cement block area" on the north side of the old cottage serving as part of the footprint of the cottage, and there was no credible evidence of any building structure or projection of any size from the rear wall of the old cottage. Only if the entire proposed new structure was on and within the parameters of the old building "footprint" would it be in compliance with the ZBA order and decision. Changing the word "footprint" to "foundations" is beyond the scope of the ZBA's decision if, as it appears defendant has tried to do, he implies a meaning different from "footprint." In this case "foundations" means "footprint."
If the court turns to Exs. X and Z, it finds both exhibits differ with each other. Neither shows a scale. Ex. X is dated April 18, 1966 and revised June 10, 1986, and purports to show the "Mildoon" old cottage with two "decks" on the cottage and steps extending beyond the decks for an undisclosed number of feet. Ex. Z, on the other hand, which has its date obliterated beyond "April 1" has handprinting on it indicating a "2 story porch deck" on the south side of the "Mildoon" old cottage with dimensions of 12 feet in length and 21 feet in width, all of it included within the "footprint" of the "Mildoon" old cottage.
An examination of Ex. QQ and Exs. B and C clearly shows the front of the old cottage with no porches such as defendant built on the new structure (both of which on the first and second floors being open porches with roofs).
There are certain other aspects of this case that advocate the issuance of injunctions. At the public hearing before the ZBA, defendant and his then counsel referred several times to construction to be erected on the "footprint" of the old cottage. The ZBA's order specifically used the word "footprint" for the new structure to be guilt upon. This clearly was intended as a limitation on size. (See Section III above.) In Ex. DD at bottom of page 9, top of page 10, defendant personally CT Page 4605 stated, "I am not enlarging the footprint . . . . My footprint is smaller — substantially smaller than theirs." When, however, defendant filed his briefs, instead of "footprint" he sought to shift to the word "foundation" and sought to enlarge the "footprint" as it was in 1986 when defendant applied for a variance to include not merely the "footprint" of the old building as it stood in 1986, but some other claims for what he said was the "foundation" 20 or more years earlier of something else that allegedly existed without credible evidence at the rear of the old building. All of this appears to be in clear contradiction to Exhibit QQ showing the rear wall of the old building as it was in 1986, and as far as the court can determine, continued to be long before 1986. The statements by defendant or his counsel are only treated as admissions in this memorandum and cannot in any manner vary the meaning of ZBA's final decision (Ex. BB). See 3 Anderson, American Law of Zoning (3d Ed.) 20.65.
In portraying "Mildoon" there are unexplained dashes across the width of the old cottage. Both exhibits show a projection 4 feet by 10 feet of the rear wall of the old cottage which clearly did not exist on August 1, 1986, when the zoning enforcement officer's stamp of zoning compliance was affixed to Ex. Z. It would appear that the confusing differences in these exhibits is probably due to the fact that the zoning enforcement officer was negligent in affixing approval stamps without examining carefully what was contained in these exhibits, their dates, and the handwritten additions, and certainly without observing that the "footprint" of the "Mildoon" cottage as depicted on these exhibits and without observing that the 2-story porch and deck, so-called, was totally outside that footprint. As the new building was constructed, they are not within that footprint and, therefore, are not in compliance with the ZBA's decision.
Finally, nothing in Ex. BB, the ZBA's notice of decision, mentions anything about "decks on the front of the new structure with steps or a rear protrusion or steps and a porch on the east side of the new building." It mentions the maximum height of the new building, no occupancy on the third floor, minimum one year lease, and "house to stay within the footprint." By no stretch of the imagination can the ZBA's decision be interpreted to justify the manner in which defendant added on the front porches, the large rear protrusion built on a new poured cement foundation outside of the footprint of the old cottage, or the CT Page 4606 small porch and steps on the east side of the new structure. If these items were to be authorized by the ZBA, they should have been included in Ex. BB and they were not. Ex. BB was the final distillation of the ZBA's decision on defendant's application, and any ex parte or ad hominem attempt to change or add to it thereafter without a public hearing on a new application for variance was invalid. The defendant, as a seasoned lawyer of long standing and town counsel, has to be charged with this knowledge.
It follows from what the court has said that the zoning enforcement officer's certificate of zoning compliance (Ex. KK) (which, incidentally refers to application number 17626 whereas the notice of decision, Ex. BB, refers to case number 10242) has no significance or effect. If Ex. KK applies to the instant case, it has no greater efficacy than the ZBA's decision which the court has interpreted to establish that in several substantial respects the new structure fails to comply with the ZBA's decision (Ex. BB).
 IV
With the situation depicted above as to the old structure and the new (structure, one would next ask what effect did the defendant's construction of the front porches and the rear projection on the rear wall have upon the Simko's house and the Varga's house?
The court took a view of the new exterior premises involved in this litigation accompanied by counsel on both sides. It was not, however, able to enter inside defendant's new premises because it was locked and defendant's counsel did not have the key and did not obtain it while the court was there. This prevented the court's examination of the interior basement walls. The court took a second exterior view of the new premises on April 7, 1993. The court could observe and finds, from the kitchen of the Varga property, that a view of a small, attractive garden on the Simko property was totally blocked from view of Varga by the addition of the rear protrusion two stories high on the new structure erected by defendant. When the old structure was in existence, this view was unobstructed from the Varga property.
As for the plaintiff Simko, the construction of the front porches has definitely disturbed substantially the view looking CT Page 4607 south from the second floor of plaintiff's house. Prior to its construction, there was no such obstruction to such view looking south toward Long Island Sound over its waters. This is beach front property, one of whose purposes is to provide a view of the Sound to the south and west. The defendant's second floor roofed porch substantially diminishes this view. A real estate expert offered her opinion that the obstructed view diminishes the value of plaintiff Simko's property by approximately $38,600.00. The plaintiff Simko's property before defendant's construction had a value of $700,000.00. The court finds these figures as facts.
Furthermore, aside from the permanent depreciation in value of plaintiff Simko's property, there is added the substantial factor of disturbing the quiet, comfort and privacy of the Simko premises each time plaintiff looks out toward Long Island Sound to the west and finds the view materially blocked by the defendant's second floor porch and almost within arm's reach. This will remain a constant, jarring reminder to her of the defendant's taking advantage of her by constructing the new house in violation of the ZBA's order.
Plaintiff Varga faces a similar reaction when she looks out her kitchen window and, instead of viewing the Simko flower garden as before, she finds nothing but a huge 10 and 1/2 foot wide, two and a half story projection from the rear wall of defendant's new house. There is no doubt such a monstrous protrusion on the rear wall did not exist on the old cottage in 1986. These are things that are not adequately compensable with money damages alone for either plaintiff.
The importance of view, light, air and privacy of a house is emphasized in many cases involving fences. The court mentions these solely to emphasize the law's recognition of these intangible factors and their adverse effect on residential real estate as things deserving of consideration. See, e.g., Whitlock v. Uhle, 75 Conn. 423, 424, Scott v. Wilson, 82 Conn. 290; Harbison v. White, 46 Conn. 106, 107-108; DeCecco v. Beach,174 Conn. 29; Pascale v. ZBA, 150 Conn. 113, where the court, in interpreting a zoning ordinance, pointed out incidentally that steps of an outside stairway to the second floor would not only "obstruct free passage of air" but also would, by reducing the side yard width, lead to easy communication of fire between buildings, a condition that side yard regulations seek to avoid. CT Page 4608
The question of view from a house is a matter of considerable value in determining the worth of such a house as determined by several other cases. An example of this can be found in cases such as Anderson v. Latimer Point Management Corp., 208 Conn. 256. One Bindloss owned a whole peninsula and leased lots to various individuals, requiring his approval for any proposed construction. "Part of his motive for this requirement was to maximize the the water views for all the lessees (p. 258). Although not perfectly accomplished, existing houses are situated on the various lots so as to afford the lessees a view of the water." (p. 259) His approval for alterations on existing structures "would not be unreasonably withheld. With the exception of existing trees, vegetation was not to obstruct the water views of other sublessees." The court refused to grant plaintiff an injunction restraining defendant's interfering with a proposed second story addition to plaintiff's cottage because the proposed addition would substantially interfere with the water views of others. (p. 262) The court in Anderson, as in the present case, had the benefit of a view of the premises involved. See also Harris v. Pease, 135 Conn. 535, where a picturesque view of property is evaluated as a substantial property right. An injunction was issued in favor of plaintiff to preserve the landscape's view.
Another case in point on the question of view is DeCecco v. Beach, 174 Conn. 29, 31, where the plaintiff and defendant were abutting property owners whose parcels bordered on the west branch of the Saugatuck River in Westport. Plaintiff's house was situated upon his property so as to maximize the river view. Defendant constructed a ten foot high stockade-type of fence on her property along the common boundary with plaintiff's land following the contour of the property and forming an angle directly in front of plaintiff's house. It ran 63 feet long in 14 sections of six feet each and extended to approximately two feet short of the river. Plaintiff had a view of the river adjacent to his property on one side but no view of the river on the other side because of the last our sections of the fence closest to the river. The last four sections of the fence were particularly objectionable and unsightly to the plaintiff. DeCecco cites Scott v. Wilson, 82 Conn. 289, 290, another fence case, in which a tight board, six foot high fence on the boundary between plaintiff's and defendant's lots was not only unsightly but "cuts off the view from the plaintiff's premises." "An injunction issued in favor of the plaintiff." in both DeCecco and Scott. CT Page 4609
It is manifest from these cases that an attractive view from one's property is a proper subject for protection as a matter of public policy, and will be protected where necessary when a structure is erected without legal authority. While the above cited cases have fact patterns different from the instant case, they do lead us, nevertheless, to the proposition that the court will act to grant relief to a plaintiff when his right to a view from his residential property is destroyed or obstructed in whole or in part by illegal activity of a neighbor.
 V
The court will now address the defendant's Special Defenses on which, of course, the defendant had the burden of proof.
1. Defendant pleaded that plaintiff have not exhausted their administrative remedies. An adequate answer to this claim is found in Cummings v. Tripp, 204 Conn. 67, 74: Reynolds v. Soffer, 183 Conn. 67, 71. The defendant has failed to meet his burden of proof on this Special Defense. See Fitzgerald v. Merard Holding Co., 106 Conn. 475.
Defendant cites Upjohn Co. v. ZBA of North Haven, 224 Conn. 96,104, where plaintiff, to whom ZBA had issued a permit in 1983 subject to 20 conditions, one of which plaintiff failed to comply with. In 1986, zoning enforcement officer issued a cease and desist order against plaintiff to remove sludge. Plaintiff appealed on grounds the order on sludge set out in 1983 was void. The court refused to grant relief to plaintiff because plaintiff could have challenged it in 1983 when plaintiff obtained its permit but failed to challenge it then. Upjohn is not controlling in the present case because plaintiffs do not challenge the ZBA's order, only the lack of compliance with it by defendant Ervin.
2. While defendant may have completed his new building, this did not make any relief "moot." Frower v. Tree Warden, 26 Conn. App. 599
represents a totally different fact pattern from the present case and does not serve as controlling authority here. The actual controversy in the present case still exists. It involves the question whether defendant has properly acted in accordance with the decision of the ZBA. The request or injunctive relief encompasses both negative and affirmative relief from the court. CT Page 4610
3. The ZBA is not a necessary party to this action. The request for a declaratory judgment is only one of the claims made by plaintiffs. The court will not act on this request by plaintiffs.
4. Defendant pleaded that, under a 1989 amendment of the zoning regulations affecting defendant's property, the conditions set by the ZBA are irrelevant inasmuch as defendant's building now conforms to new regulations. Defendant has failed to prove this defense. There was no evidence offered at trial on this claim, and the court, therefore, finds it abandoned.
5. Defendant pleaded plaintiffs have "unclean hands" because they misrepresented that zoning enforcement officer refused and neglected to take action in response to plaintiffs' request that he do so. The court finds there was no misrepresentation by the plaintiffs. The zoning enforcement officer did refuse to act when requested by plaintiffs, claiming defendant was in compliance with the ZBA decision. Furthermore, the court respectfully disagrees with the conclusions in the decision of Jacobson, J. on January 17, 1989, in this case.
6. The defendant's completion of the work on the house does not render the issues in this case moot.
7. The ZBA is not a necessary party to this action.
 VI
Defendant makes a claim in his brief that Connecticut General Statutes 8-13a applies here. This issue was not litigated during the trial nor was it pleaded as a Special Defense. It is not, therefore, up for consideration.
Contrary to defendant's claim in his brief, the court finds that plaintiffs have proved the house constructed by defendant is not entirely "within the footprint" of the old cottage. There is nothing to justify the construction of the protrusion that defendant built as part of the rear wall of the new house. It appears from Exs. PP and UU a portion of the rear wall had been removed when these photographs were taken, leaving a large gap in the rear footprint which was not there when the rear wall was in place as shown in Ex. QQ; otherwise, there would have been nothing to support the old wall for the length of that gap. CT Page 4611 For the same reason, the front wall footprint has been altered as shown in Ex. F when compared to the front wall footprint in its original state as shown in Ex. UU. The large gap mentioned above in Exs. UU and PP appears to have been the result of some work that was done after demolition, changing the appearance of the footprint of the rear wall of the old cottage.
Defendant spoke of a porch of some kind that was allegedly there some 20 years previously. The court finds that no structure of any kind existed outside the rear wall of the old cottage as shown in Ex. QQ at the time of defendant's application for a variance in 1986. Ex. QQ corroborates this finding, showing nothing protruding from the rear wall of the old cottage. Furthermore, in Ex. W, defendant's application to the ZBA for a variance, defendant mentions "to enlarge existing nonconforming structure" but says nothing about erecting a two and a half story house with two porches on the front of it and a large protrusion from the rear wall, both of which are outside of the footprint of the old cottage.
Ex. 2 on page EC-1 shows, in the upper left hand corner, what purports to be a drawing of the north elevation of the old cottage showing no structure outside the rear wall (north elevation) and no protruding structure of any kind. But then in the upper right hand corner it adds on a protrusion 4 feet by 10 feet that did not exist as part of the rear wall of the old cottage in 1986. This is a clear misrepresentation of what was there in 1986. See Ex. QQ.
Contrary to defendant's claim in his brief that the court cannot consider the propriety of what went on behind the scenes between the defendant, Mr. Gumpper and the ZBA starting with a letter from defendant to Mr. Gumpper (Ex. FF), all outside of a public hearing, the court finds that it does have the right to judge the significance of Ex. FF, the manner in which it was composed by defendant (not by Mr. Gumpper or the ZBA at a public hearing), its credibility and its effect upon this case on the question of remedy. All these proceedings were strictly based on arguments ad hominem, were ex parte, and raise the further question whether the ZBA and Mr. Gumpper, deliberately or inadvertently, were not treating all parties to the litigation "even handedly." If there was any "clarification" necessary, as defendant claims, this certainly was not the way to obtain it. All of this casts a shadow on the zoning enforcement officer's refusal to take action. Furthermore, the court does not find CT Page 4612 that any "clarification" of its order was necessary. What the ZBA attempted to do here was in effect to change the original order without the usual process of a public hearing on a new application for a variance. The case of Rodine v. Zoning Board of Adjustment, 434 N.W.2d 124, 126-127 (Iowa App. 1988), aptly expresses the disapproval of ex parte communications between board members exercising their adjudicatory functions and interested parties. "We determine there are compelling considerations, including the basic considerations of fairness, which demand ex parte communications . . . should not occur." (P. 127) See also 83 Am.Jur.2d Zoning Planning 184 citing Rodine. "The public hearing requirement does not permit a private, ex parte conference with a litigant." Maitland v. Pelican Beach Properties, Inc., 892 F.2d 245 (3d Cir. 1989), where the court spoke as follows about a Coastal Zone Management Committee [CZM]:
 "In allowing ex parte information to be presented to its Executive Session . . . the Board committed two errors. First, it considered `evidence' that had not been presented before the CZM; second, it failed to notify McCarthy [an opponent] of the Executive Session, at which it considered this ex parte `evidence' and thereby deprived McCarthy of any opportunity to respond to the new material introduced. (P. 251)
 ". . . fairness alone — to say nothing of due process considerations — required that McCarthy be given an opportunity to explain, refute or test the `evidence' presented by [defendant's] architect and counsel." (P. 252).
The court must briefly comment on defendant's strained attempt to draw from Fairfield Zoning Regulations 31.2.8 a definition of "house" not defined in these regulations which does not meet the test of accuracy. The section referred to is limited to defining "floor area" of a "dwelling" and provides that open porches and enclosed porches not heated by a central heating system for the dwelling are not to be counted in determining the required floor area. This does not ordain nor state that such porches are not part of the house to which they CT Page 4613 are attached. It merely eliminates their floor area in determining the adequacy of the maximum floor area requirements for customary house occupation or office in a dwelling.
 VII
An injunction is a formal command of the court directing persons named to refrain from doing certain specified acts, or commanding them to take certain action to undo the wrong or injury with which they are charged, a command to refrain from or to do a particular act. 42 Am.Jur.2d Injunctions, 1; 7 Rohan Zoning and Land Use Controls 52.08(1). The issuance of an injunction rests in the sound discretion of the court and requires irreparable and substantial special injury to which no legal, as distinguished from equitable, remedy is adequate. See Scoville v. Ronalter, 162 Conn. 67, 74. The court finds the evidence in this case, including the reasonable inferences to be drawn from it, to justify the granting of an injunction as hereafter set forth.
The general rule on injunctions is laid down in Bauby v. Krasow, 107 Conn. 109, 115, as follows, with modifications set forth in Sisters of St. Joseph, cited hereafter:
 Whether . . . [a mandatory] injunction should issue depends upon all the equities between the parties . . . . when one has gone on wrongfully in a wilful invasion of another's rights in real property, the latter is entitled to have his property restored to its original condition even though the wrongdoer would thereby suffer great loss. It has been said that the result of denying a mandatory injunction in such a case would be to `allow the wrongdoer to compel innocent persons to sell their rights at a valuation . . . .' Where, however, there has been an innocent mistake or a bona fide claim of right on the part of the defendant or laches on the part of the plaintiff, or where the conduct of the defendant was not wilful and unexcusable, and where the granting of the injunction would cause damage to the defendant greatly disproportionate to the injury of which CT Page 4614 plaintiff complains and it appears that damages will adequately compensate the latter, in such cases it has been held that it would be inequitable to grant a mandatory injunction and the plaintiff has been remitted to his remedy by way of damages.
In Bauby, one Dalton owned two adjoining lots on one of which she lived in a one family house. She sold the vacant lot to one McCarthy. Both Dalton and McCarthy later died. The deed from seller to buyer contained a clause that if grantee should erect a house on the lot, it would be a single family house. Plaintiff bought the Dalton house and defendant bought the vacant lot and began construction of a three family house. The cellar and a portion of the frame were completed when the action started and the house was completed before trial. Plaintiff sought an injunction to restrain defendant from building the three family house. Defendant knew of the agreement restricting the house to a one family structure when she bought her lot.
As modified later in Sisters of St. Joseph Corp. v. Atlas Sand, G. S. Co., 120 Conn. 168, 176-177 (cited with approval in Berin v. Olson, 183 Conn. 337, 341, where, even though a plaintiff had been awarded money damages, the court also awarded an injunction), the Sisters court stated:
 The amount of damages [to the plaintiffs] is not necessarily decisive where a right is materially interfered with by a nuisance caused by wrongful use by another of his property, if the injury is of a continuing nature involving a recurrent grievance and the multiplicity of suits to secure redress . . . . In such a case equity intervenes on account of the nature of the injury done rather than of the magnitude of the damage . . . . Also, it is not alone tangible physical injury and damage which equity regards; so far as one's enjoyment of his land is affected, it is a destruction, if not physical, yet at least in the character in which it has been held and enjoyed, of what is generally regarded in equity as not properly to be made a subject of compensation.' [Emphasis added.] [See CT Page 4615 pp. 176, 177.]
See also Burroughs Welcome Co. v. Johnson Wholesale Perfume Co., 128 Conn. 605 and Brainard v. West Hartford, 18 Conn. Sup. 223
(Alcorn, J.). See also in Town of Maynard v. Touryl,198 N.E.2d 291, 292 (Mass. 1964) the ZBA granted a variance excluding a second story on a building. Defendant nevertheless built a second story. The court ruled defendant failed to comply with ZBA grant and ordered defendant to remove it because it violated ZBA's decision.
The doctrine of comparative damages in Sisters was not so clearly applicable as to render erroneous the court's exercise of discretion in granting the injunction. In the Sisters case the defendant had built several buildings over a pipe on its land which were substantial structures of concrete or brick on concrete foundations which went down below the pipe. Nevertheless, the court granted an injunction to remove any obstruction to, or in the alternative to provide for, the free flow of the natural stream to the extent that it is discharged through a culvert. (See p. 171.)
Thus, the issuance of a mandatory injunction depends upon whether the invasion of plaintiffs' rights is willful and wrongful. The court must, therefore, determine whether defendant's action was a wilful invasion of plaintiffs' rights in their property or whether defendant has made an innocent mistake or under a bona fide claim of right, and whether the granting of a mandatory injunction, if innocent and under a bona fide claim of right, would cause damage greatly disproportionate to the injury of the plaintiffs, and it appears that damages will adequately compensate them.
The court is, of course, aware that this case is not an appeal from the action of the ZBA. Nevertheless, the defendant has to be judged in the setting in which he has placed himself. The court has already adverted to the fact that in a previous action taken by plaintiffs from the granting of the variance by the ZBA, the Connecticut Supreme Court (Simko v. ZBA, 205 Conn. 413) ruled that the plaintiffs' failure to name the town clerk in the appeal citation as a necessary party rendered the appeal subject to dismissal, and the court dismissed the appeal without considering whether the ZBA had exceeded its powers and abused its discretion in granting the variance. Thus this left the vital question in the case untouched and permitted the ZBA's CT Page 4616 action to stand by windfall to defendant. This is, however, a prime example of what sometimes can happen when a court dismisses an action on a pure technicality and allows a decision made in violation of the clear language of 8-6 (3) to remain in effect. Section 8-6 (3) reads, in part, as set forth in footnote 3.
Of course, this court cannot in any manner change the Supreme Court's decision. Nevertheless, this court is allowed to consider the fact that the defendant in this case is not just an ordinary layman who sought to obtain a zoning variance. He is a long-standing, seasoned attorney who has represented the town of Fairfield as its town counsel beginning in 1984 to the present,[4] and he must therefore be charged with the knowledge of what, under the law, is required to establish the right to a zoning variance. The key factor in 8-6(3) that an applicant for a zoning variance must have established was that his property, subject of his application, presented to him an "exceptional difficulty or unusual hardship" that justified the granting of a zoning variance. Unless this is done, there is no basis whatsoever for a ZBA to grant such a variance. The court has already pointed out in footnote 1 what Rathkopf says about the lack of a ZBA's power or authority to grant a zoning variance unless this essential factor exists, even in the absence of anyone's opposing the application or any opponent's lack of offering evidence in opposition. In other words, the ZBA has the duty to abide by the language of 8-6 (3). If it does not, it is acting in violation of the law and beyond its powers. The case of Puskarz v. Zoning Board of Appeals,155 Conn. 360, is very much in joint with what happened in the instant case when the ABA ignored its statutory duty in granting the variance. See pp. 363 and 366 where the Board granted a variance without any finding of exceptional difficulty or hardship and the court overruled it. Applicant's application made no claims of exceptional hardship, etc.
Ex. BB, the ZBA notice of decision dated August 1, 1986, grants conditionally the defendant's application for a variance but fails to state on what grounds it found any "exceptional difficulty or unusual hardship. " It is totally silent on this score. Connecticut cases have repeatedly set forth the rule placing the burden of proof on the applicant for a zoning variance to establish the "exceptional difficulty or unusual hardship" necessary under 8-6(3). See Kelly v. ZBA, 21 Conn. App. 594,597-599. CT Page 4617
In 5 Williams "American Land Planning Law," 136.01, the author refers to the presumption against granting variances:
 ". . . A large number of Connecticut cases have emphasized that variances should be granting sparingly . . . — that is, have in effect set up a small presumption against granting a variance. In one important case the court put this point strongly:
 `The obvious reason is that, unless great caution is used and variations are granted only in proper cases, the whole fabric of town-and-city-wide zoning will be worn through in spots and raveled at the edges until its purpose in protecting property values and securing orderly development of the community is completely thwarted.'"
See Heady v. ZBA, 139 Conn. 463, 467.
A substantial group of Connecticut cases over the years have emphasized that no variance is available just to allow the owner of property to make more money. Grady v. Katz, 124 Conn. 525, and a long list of citations in note 6 of Williams, op. cit. 136.01.
The court emphasizes the widespread and well-known rule on zoning variances to demonstrate why every seasoned and long standing member of the bar must be charged with that knowledge. In Hyatt v. ZBA, 163 Conn. 379 at 383-384, speaks as follows:
 "Only rarely may a zoning ZBA grant a variance encompassing the erosion of a nonconforming use. `It is a general principle in zoning that nonconforming uses should be abolished or reduced to conformity as quickly as the fair interest of the parties will permit. In no case should they be allowed to increase . . . .' The alteration or substantial remodeling of a building existing as a nonconforming use is logically inconsistent with the principles that `[a]n essential purpose of zoning regulations is CT Page 4618 the stabilization of property uses;' fundamental structural improvements will serve only to perpetuate the nonconforming use."
See Garibaldi v. ZBA, 163 Conn. 235, 239, where the court says a variance is not a personal exemption from enforcement of zoning regulations. "It is for this reason that the rule is well established that the financial loss or the potential of financial advantage to the applicant is not a proper basis for a variance." Accord: Laurel Beach Assn. v. ZBA, 166 Conn. 385,387-388; Ward v. ZBA, 153 Conn. 141, 143, where the court says: "The hardship requirement is a fundamental one in innumerable opinions of this court in recent years . . . ." and the burden of proof rests with the applicant. 83 Am.Jur.2d, Zoning 
Planning, 784: "The burden of proof is heavy, and the reasons for granting [a variance] must be substantial." Without proving the basis for a variance, defendant's application to ZBA was a clear violation of the first sentence of 2.5.1 of the town zoning regulations.
The court has already pointed out in footnote 1 the defendant's answer to question 12 in his application regarding specification of the "exceptional or unusual hardship" justifying a zoning variance, and nothing is set forth there that remotely fits the definition of an "exceptional or unusual hardship. " It is in effect nothing more than a brief statement seeking to upgrade his property to allow a family to use it "year round." There is no claim of "exceptional or unusual hardship. "
This application was prepared by defendant personally, and he had to know that the ZBA had no right or power to grant a zoning variance on the basis of his application. But defendant nevertheless apparently thought for some reason he would receive favorable treatment from the ZBA notwithstanding any lack of any basis for such treatment. Unlike the ordinary layman, who usually is unaware of zoning requirements, the defendant as a town counsel of Fairfield from 1984 to the present and a seasoned attorney of long-standing had to be fully aware of the requirements for a valid zoning variance, which requirements he could not and did not fulfill. The ZBA could only grant his request if it exercised largesse outside of and beyond its authorized powers, and in doing so it failed to do justice. Defendant obviously knew this and was relying upon the ZBA's CT Page 4619 "doing him a favor," as it were. This is hardly the basis for now asserting defendant acted under a "bona fide claim of right." In defendant's case such a claim could not truly be bona fide under the circumstances laid out in this memorandum.
In spite of the overwhelming amount of case and text law barring a zoning variance without a showing of "exceptional hardship," etc., defendant nevertheless pursued this application. The court, therefore, concludes that there was no innocent mistake and no "bona fide claim of right by defendant on the facts of this case. Defendant's conduct regrettably would have to be classified as wilful and inexcusable. Ex. DD, containing a substantial portion of defendant's presentation to the ZBA at the public hearing, fails completely to add any support to the ZBA's basis for a zoning variance founded upon "exceptional difficulty or unusual hardship. " As stated on p. 3 of Ex. DD, defendant is "merely asking permission to allow [him] to improve the property." This hardly establishes the "exceptional difficulty or unusual hardship" required under the statutes.
There are other indicia that demonstrate wilful and inexcusable action by defendant. The manner in which Ex. FF was created by defendant and submitted to Mr. Gumpper for his signature. The language was defendant's, and it was submitted ex parte by defendant without any consideration given to the plaintiffs and without the call of a public hearing on a new application for variance. Exs. X and are surveys; X is dated June 10, 1986, presumably to show first floor elevation and "prop. decks" under a revision. Originally, the survey was dated April 18, 1966, and it shows a rear protrusion from the rear wall of the original building that the court finds was not there in 1986 and is contradicted by Ex. Y and also Ex. QQ, a photograph of the original cottage with the rear wall straight across with no protrusion such as shown on the rear wall in Ex. TT. It should also be noted that the wall on the left (east side of the old cottage) of the photograph, Ex. QQ, is straight across with a door in the middle of it but no porch or staircase. Only a small step-up stone appears in front of that door. This east wall also appeals in Ex. C which also shows the front wall with a door in it and no porch.
Furthermore, support for the court's finding that the new structure built by defendant clearly extended beyond the footprint of the original cottage is found in defendant's CT Page 4620 admission that the front porches are not within the footprint of the old cottage. Moreover, the new rear wall has a huge protrusion outside of that footprint. All of the additions of front porches and the new side steps on the east side and the rear protrusion of the rear wall of the new structure clearly do not fall within the footprint of the original cottage in 1986.
In judging defendant's actions in this case, the court keeps in mind 3 Anderson, American Law of Zoning (3d Ed.) 20.65 where the author points out a ZBA cannot incorporate by reference any statements made by an applicant at the public hearing, and any conditions attached to a grant of the Board where they are limited in terms of the applicant's verbal statements to the Board. See Farrell v. Appeal of DeSautels, Inc., 383 A.2d 619 (Vt. 1978), where the court said:
 "Whatever the discussion at the original (zoning adjustment) hearing, or the internal considerations which prompted board members to grant the requested permit, no condition respecting future use of the premises found its way into the findings as filed or the order as issued. We cannot subscribe to the proposition that a formal written order which contains some express terms and conditions can be said to carry with it silent and unexpressed terms and conditions . . . . The maintenance of official records surely has a definite purpose; one need only consider the flight of a subsequent purchaser in order to perceive the sagacity of the requirement that conditions imposed be express, and that conditions not expressed in the findings and order be disregarded, whatever the state of mind and unexpressed considerations of the adjudicating body.
 The contention of the Town that the original parcel had been legally `committed' under certain self-imposed restrictions mentioned by the appellant before the Board of Adjustment is untenable. Conditions imposed by a zoning board must be expressed with sufficient clarity to give notice of the CT Page 4621 liens on the use of the land, and cannot incorporate by reference statements made by an applicant at a hearing."
See also Dahar v. Dept. of Bldgs. of Manchester, 352 A.2d 404
(N.H. 1975), where an application for a variance for a six foot fence failed to mention an increase in ground grade where applicant erected an eight foot fence. The court stated the latter violated the terms of the variance; Town of Warren v. Frost, 350 A.2d 608 (R.I. 1976); Proskin v. Donovan, 541 N.Y.S.2d 628, (A.D. Dept. 1989), app. den. 75 N.Y.2d 702, where a variance contained a condition that exterior design and appearance be maintained applicant changed exterior to granite from clapboard, and the court required dismantling of granite at his own expense because he created his own practical difficulty. 83 Am.Jur.2d 928. Of course, any statements made outside of a public hearing have even less efficacy in varying the ZBA's final decision (Ex. BB).
The court is also guided by Mercado v. Bannan, 173 F.2d 554,555 (1st Circ.) where Clark, Circuit Judge of 2d Circuit, sitting by designation, defined the word "wilful" in a civil statute as follows:
 Willfulness (sic) in violating a regulatory statute implies not so much malevolent design as action with knowledge that one's acts are proscribed or with careless disregard for their lawfulness or unlawfulness.
While the instant case involves an official ZBA decision and not a statute, the definition in Mercado is close enough to be applicable in its substance.
 VIII
Having found the issues in favor of plaintiffs, the court now reaches the question of remedy. While this case is not an appeal from the ZBA's decision, nevertheless the actions of the defendant in pursuing his application for a zoning variance when he was charged with knowledge as previously indicated that he could not establish the essential "exceptional difficulty or unusual hardship" required by law are factors to be considered by the court on the question of remedy in this case. (See Ward CT Page 4622 v. ZBA, 153 Conn. 141, 143-146, for another discussion of the requirements for the granting of a zoning variance.) A brief recapitulation of a few of the other factors that must be considered which have been previously discussed are:
1. Ex. LL-1, Application for Certificate of Zoning Compliance (3/4/88) in which defendant states that two open porches (12 ft. x 21 ft. and 8 ft. by 21 ft.) "all on existing foundations." The latter statement misrepresents the facts. Furthermore, nothing is mentioned of the rear wall protrusion. See also Ex. LL-2, Application for Certificate of Zoning Compliance containing the same representations.
2. EX. CC, Notice of Filing for a Variance, speaks only of a variance of side yard requirements and an enlargement of an existing nonconforming structure. This would at least require, as represented in Ex. LL-1, everything to be built "on existing foundations." The court has found that the front porches and the rear protrusion as well as the side steps on the east side of the new structure are not built on the existing footprint of the old cottage as it stood in 1986. The front porches, the rear wall protrusion, and the side steps should have been built within the footprint of the old cottage as it stood in 1986, the date of plaintiff's application. See Ex. QQ, the old cottage; Ex. C showing the front wall and east wall of the old cottage; and Ex. E showing a portion of the front and sides of the old cottage; and Ex. PP showing more of the footprint of the old cottage. The most significant of these exhibits is Ex. QQ which clearly establishes the clear footprint of the old cottage on its rear wall (straight across) with no protrusion of any kind and its east wall which is straight across.
3. The use of Exs. X and Z, misleading surveys that do not represent the old cottage as it was on the date of application in 1986 because they show a protrusion from the rear wall that did not exist and are contradicted by Ex. QQ showing the old cottage with a rear wall straight across with no protrusion.
4. The manner in which Ex. FF, a letter addressed to Mr. Gumpper and the ZBA, was created and handled by defendant ex parte in an effort to have Mr. Gumpper and the ZBA agree with defendant's interpretation of the ZBA's conditional CT Page 4623 grant.
5. Ex. J showing new circles of concrete embedded in the ground clearly outside of the footprint of the old cottage, obviously to support the two porches defendant was seeking to include with his new structure.
In view of the fact the defendant, as town counsel between the years 1984 and 1988 during which the original litigation between the parties was active, certainly knew what the requirements of Connecticut General Statutes 8-6 (3) were for a zoning variance, his total failure even to claim any "exceptional difficulty and unusual hardship" on his application for a variance, and in the absence of such a claim nevertheless to pursue his application, the wilful and deliberate construction of the rear protrusion on the rear wall of the new structure beyond the old cottage footprint even though in 1986 there was no reasonable basis for making this claim and thereafter failing to abide by the ZBA's decision to keep the new structure within the footprint of the old cottage, similarly, the construction of the two front porches admittedly outside the footprint of the old cottage, the use of inaccurate, confusing and misleading surveys, the incident described above concerning Ex. FF and the ex parte, ad hominem approach to the ZBA without filing a new application for variance, all of these acts regretfully disclose wilful and inexcusable conduct.[5]
Under these circumstances, as stated in 4 Rathkopf's Law of Zoning Planning (Ziegler), 45.20(d), when an action is brought by adjoining landowners, as in this case, plaintiffs are not required to accept money damages in lieu of removal of structures to the extent necessary to bring the new structure into compliance with the ZBA's decision. See, also, Crady v. Newcomb, 530 N.Y.S.2d (A.D. 4. Dept. 1988) 365, 366, owners of adjacent land can enjoin violation of zoning ordinances regardless of whether the value of their property interests are harmed by the violation and Sun-Brite v. Board of Zoning, et al, 515 N.Y.S.2d 418, 422; Pinewoods Assoc. v. W. R. Gibson Develop. Co., 783 S.W.2d 478, 480 (Mo.App. 1990); 2 Dobbs, Law of Remedies, 7.3(5), p. 324.
2 Dobbs Law of Remedies, 7.3(5) at page 324 has an interesting commentary on the injunction remedy which protects private rights as well as property rights: CT Page 4624
 "The contemporary view is that personal rights are protectible by injunction in the same way that property rights are protectible. For example, . . . an invasion of privacy may be enjoined.
 The traditional view that equity would protect only property rights, not personal rights has become obsolete . . . because equity never used the forms of action and relied instead on any individualized complaints, it sometimes gives relief when the case does not fit traditional molds at all and might not be actionable for damages. In cases of this sort, the injunction order seems to be at the top of the `hierarchy' of remedies."
See also Little Joseph Realty v. Town of Babylon,363 N.E.2d 1163, 1168 (N.Y. 1977), violation of a zoning ordinance; Swaggerty v. Petersen, 572 P.2d 1309 (Ore. 1977), violation of density provisions of subdivision regulations, injunction ordered for removal of two houses, the court saying defendant was responsible for creating his own hardship. Some of the above citations in this paragraph involve violations of zoning ordinances, but the court finds their rationale is equally applicable to violations of a zoning board's decision based on the language of the ZBA's decision which must be interpreted objectively and not subjectively because it is the ZBA's final public judgment in this matter.
Therefore, the court hereby issues a mandatory injunction that defendant remove from his property at 909-911 Fairfield Beach Road, Fairfield, within six (6) months of the filing of this memorandum of decision with the Clerk of the Superior Court at Bridgeport, the following building additions which he constructed outside of the 1986 footprint of the original cottage, the limitation placed upon these additions by the decision of the ZBA, including the two front porches and the roofs over them and the protrusion on the rear wall of the new structure. Since defendant created his own hardship in building these items, the work must be done at his own expense.
Plaintiffs' counsel is ordered to frame the exact language of the injunction, present it to defendant or examination, and then to the court for final approval. If either plaintiffs or CT Page 4625 defendant wish to be heard on the contents of the injunction as prepared by plaintiffs, the court will set a hearing date upon request.
BY THE COURT
GEORGE A. SADEN JUDGE TRIAL REFEREE